Liston F. Coon, J.
This has been a combined hearing to suppress tangible evidence seized by police as a result of a series of events occurring on September 3, 1974. Some of the moving papers are in the form of a motion to controvert a search warrant but the thrust of the entire proceeding is to suppress items seized at two locations, one being apartment IB at 445 West 48th Street, Borough of Manhattan (hereinafter referred to as 48th Street) and the other being apartment 6A at 327 West 30th Street, Borough of Manhattan (hereinafter referred to as 30th Street). The former apartment was regarded as being occupied by the defendant Mejia and the latter apartment was regarded as being "utilized” by the defendant Sarmiento (Mono) and one "Oscar” whose identity was not firmly established at the hearing. Also involved in the overall picture is a defendant known as Evangelista Navas Villabona, also known as Mario Rodriguez and a defendant known as Estella Bonilla Nocua, also known as Estella Rodriguez, purportedly the common-law wife of defendant Navas. While there are numerous indictments pending against the latter two and while the original search warrant application involved their apartment in the Borough of Queens, they are not part of this proceeding. It might be added that another apartment in the Borough of Queens was involved in the search warrant application but the Queens warrants were not issued until September 4, 1974.
Following are the court’s finding of facts and conclusions of law.
FINDINGS OF FACT
For many months prior to September 3, 1974, there was an on-going investigation being carried out by the Special Assistant District Attorney of the Special Narcotics Parts of New York County and a combined task force of various law enforcement agencies. The investigation included the use of extensive court-authorized eavesdropping warrants, undercover agents, surveillance teams and informants. The aim was to identify and eventually arrest and prosecute individuals *924 involved in large-scale trafficking of narcotics, principally cocaine, being conducted in the United States from the source of supply in Colombia, South America. As a result of the investigation literally dozens of persons were discovered to be enmeshed in the web of the cocaine traffic. Many persons were arrested and many others identified in an overall conspiracy in the cocaine trade. It developed that an organization existed with various persons holding certain levels of command in the multi-tiered operation. Other foreign countries were involved and persons moved in and out of the United States, some as couriers, or "mules”, for the purpose of smuggling the drugs and some of the individuals regarded as among the "higher-ups” were seen and identified in this country. Among these was one Alberto Bravo, regarded as a top echelon principal.
Towards the end of August, 1974, the investigation was marching towards a climax. Some of the top people including Alberto Bravo and one Bernardo Roldan were no longer visible in the United States. From the wiretaps it appeared to police authorities and to the prosecutors that others were in the process of attempting to leave and that the large-scale operations at least were going to be curtailed.
A command decision was made "move in” on those regarded as the main traffickers and dealers. Search warrants were to be sought and arrests contemplated.
Very early in the morning of September 3, 1974, the operation went into "high gear”. The District Attorney’s office started to assemble the information for inclusion in the application for the search warrants, along with Detective Luis Ramos, who, as one of the main principals of the investigation, had been working on the case for a long time. He furnished information gleaned from wiretap intercepts and surveillance reports over the past several days. He was in contact with other officers throughout the day and passed this information on to the prosecutors. Meanwhile surveillance was maintained of the 30th Street and 48th Street apartments. Special attention was given to ascertain the movements of the defendants Mejia and Sarmiento, as well as others deemed to be involved.
In the early morning of September 3, 1974, Police Officers Mulligan and Finley were detailed to go to Apartment 6B at 30th Street to set up a surveillance of apartment 6A. This was accomplished by peering through a peephole in the door. By *925 radio they were in touch with fellow officers outside the building. Beginning at around 2:00 p.m. considerable activity was seen and heard. Rustling of paper inside apartment 6A and movement of furniture were heard. Persons were seen to leave the apartment carrying packages. These were wrapped so that no contents were visible. The information was communicated to the officers outside the building who reported that the persons did not exit the building with the exception of one Bello (arrested but not a defendant here). Mulligan and Finley deduced that narcotics were being moved but that it was to some other part of the building. This information was communicated to superiors, including Detective Manning.
Meanwhile Detective Manning was also involved in the surveillance of the defendant Mejia along with Lt. O’Shea and Detective Caracappa. In the vicinity of the 48th Street apartment Mejia was observed standing on a street corner. Navas (Mario Rodriguez) was seen to arrive in an automobile. He was carrying a red plastic bag similar to a shopping bag. They entered the building where apartment IB was located and then were seen to leave the building. Manning and the others then left the area but a Detective Palazzotto was advised of the events and told to set up a surveillance in the 48th Street area. He did not immediately see Mejia but his instructions were to notify his superiors if he saw Mejia. Although he had previously been told that he could arrest Mejia on charges of conspiracy, he did not have a specific instruction to do so at this point, it being somewhere around 2:30 p.m.
An event was then to take place which precipitated a whole new course of activity. The defendants Sarmiento and Ramirez were arrested on a street in Queens. A wave of consternation apparently swept those in charge of the operation. The search warrant application was not yet completed, let alone its presentation to a Judge or issuance of any warrants. The fear apparently was that the arrest of Sarmiento might have been observed by a confederate who would communicate the same to those at 30th Street and 48th Street and that flight or at least disposal of any narcotics at those locations would take place. Sarmiento was arrested apparently shortly after 3:00 P.M.
Orders went out to enter and secure the 30th Street apartment and Detective Palazzotto was directed to arrest Mejia sometime later at about 5:00 p.m. when he observed Mejia arrive back at his apartment building. The order was some *926 what qualified in that he was told to effect the arrest if he "saw it fit.”
At about 4:00 p.m. the 30th Street apartment was entered by police officers without notice to any occupant. Involved were a Sgt. Troglio, a Sgt. Geberth and Detective Manning. Troglio and Geberth burst through a rear window covered by Venetian blinds. The apartment door was opened by one of them to admit Manning. There were back-up officers with Manning including Detectives Caracappa and Rodriguez.
Inside the apartment was found the defendant Lopez. Shortly thereafter the defendant Rojas was arrested outside the building and brought to apartment 6B and eventually to 6A. Inside 6A a preliminary search of the apartment was made by Manning. By visual observation he observed a brown paper bag containing money. He also opened two closets, saw packages deduced by him to contain narcotics and a bag containing two pairs of shoes with torn soles covered with a white powder. Nothing was touched and orders to merely secure the apartment pending arrival of a search warrant were followed out. Defendant Lopez was under arrest since custody was maintained over him.
As indicated, Detective Palazzotto observed the defendant Mejia at about 5:00 p.m. Mejia arrived at the apartment building in a taxicab accompanied by the defendants Padilla and Valenzuela. They entered the building carrying shopping bags. After a short period to set up security measures, Palazzotto went to apartment 1A and knocked on the door. It was opened a few inches by Mejia. Palazzotto identified himself, showed his shield and told Mejia he was under arrest. A chain still held the door partially closed. As Mejia retreated several steps, Palazzotto forced the door open, breaking the chain, and entered the apartment with gun drawn. Present were Mejia, Paddilla, Valenzuela and also the defendant Salazar. All were placed against the wall, frisked and placed under arrest. On a bed was a large quantity of United States currency and a cardboard with names and figures on it.
Again, as in the case of 30th Street, the officers’ orders were to secure the apartment pending arrival of a search warrant. No defendant was or would have been permitted to leave. A preliminary search of the apartment was made for other persons and weapons. Later after being joined by Sgts. Ge-berth and Troglio, Detective Manning pointed out the red *927 plastic bag he had seen earlier. Nothing was seized except that around 7:00 p.m. the money lying open on the bed was started to be counted. Reports were made back to headquarters concerning the entry and the arrests.
Meanwhile, back at the command post at 26 Federal Plaza, the search warrant application was still being prepared. This is manifest since the moving affidavit of Detective Ramos recites the entries into the 30th Street and 48th Street apartments. The typing of the warrant did not start until after 6:00 p.m. and was not finished until about 10:00 p.m.
Once ready for presentation the proposed warrants and supporting documents including appendices of wire-taps papers, were taken to the home of a Justice of this court by Detective Ramos, as applicant, Assistant District Attorney Fishman and Officer Mulligan as driver of the vehicle. The group arrived shortly after 10:30 p.m. and after consideration by the Judge, the warrants were signed in the area of 11:00
P.M.
Officers Ramos and Mulligan went first to the 48th Street apartment where the warrant was executed. The warrant for the 30th Street apartment was then delivered and executed. The evidence seized is described on the respective returns and need not be detailed here.
Thereafter all of the arrested defendants were taken to 26 Federal Plaza and processed.
ISSUES
Because of the unique nature of the entries and arrests in this case, it is deemed appropriate to raise a number of legal issues confronting the court.
Was there probable cause for entering either of the apartments to make arrests, apart from the pending search warrant applications? Did "exigent circumstances” exist, as contended by the prosecution, for entering either apartment? Do police authorities have the right to enter and secure premises in anticipation of issuance of a search warrant? Assuming the right to secure premises pending issuance of a search warrant, how long may individuals be held incommunicado pending the arrival of the search warrant? Would the search warrants have been issued except for the data included in the moving papers already indicating the entries into the apartments?
*928 CONCLUSIONS OF LAW
It is the court’s conclusion that the real issue in this case is whether or not an interior area of a dwelling may be secured by the police and persons found therein detained — and to what extent — pending issuance of a search warrant. «
The evidence adduced and as demonstrated by the People’s theory is clear that the entries were not to arrest and search based upon "exigent circumstances” or upon probable cause because the orders were not to touch anything pending arrival of the warrants.
Furthermore, the defendants, once arrested, were not taken without unnecessary delay to a local criminal court for the filing of accusatory instruments as required by CPL 140.20. There is no question but what the individuals found in the apartments were under arrest since their freedom had been curtailed and they were not free to leave (People v Shivers, 21 NY2d 118).
Although the doctrine of "exigent circumstances” for the purpose of warrantless entry and arrest is accepted in this State (People v McIlwain, 28 AD2d 711), its traditional application was not the motivation for the entries here. Assuming that it were, the doctrine would be inapplicable. None of the activities or observations at the 30th Street apartment provided the initial probable cause to effect arrests to which exigent circumstances, if present, would then apply. The facts were insufficient to raise the level of suspicion and equivocal behavior to probable cause (People v Davis, 36 NY2d 280). The wrapping of paper and movement of furniture and the departure of persons carrying packages were as susceptible to innocent behavior as to culpable conduct (see People v Brown, 24 NY2d 421). Exigent circumstances simply did not exist. The apartment was allegedly "utilized” by the defendant Sarmiento. He was already under arrest at a point some distance away. Until the apartment was entered and the defendant Lopez identified therein, there was no knowledge on the part of the police officers who, if anyone, was in the apartment. The arrest of Sarmiento on a public street did not create an exigent circumstance.
The case of People v McIlwain (supra) is clearly distinguishable. There the police already had probable cause to arrest the defendant in the apartment when the "rustling about”, "moving about” and "toilet flushing” was heard. Equally distin *929 guishable is People v Frank (43 AD2d 691). A specific crime had already been committed and the police arrived a few hours after its commission. That the police were in possession of knowledge that extensive narcotics trafficking was going on among a large number of persons is granted but the evidence fails to show any knowledge that contraband was actually present in the apartment (People v Floyd, 26 NY2d 558). As suggested in the latter case, the posting of officers outside the apartment would have sufficed, pending the arrival of a warrant. "The common thread of 'exigent circumstances’ is something out of the ordinary and, in this regard, one of the factors always to be considered is that of a reasonable alternative” (People v De Vito, 77 Misc 2d 463, 469).
Furthermore, in People v Taggart (20 NY2d 335, 340, 343) the Court of Appeals said, "To limit its use to exigent circumstances the police action must relate to matters gravely affecting personal or public safety” and "not by the problems associated with the enforcement of sumptuary laws * * * such as narcotics violations”.
In light of the ultimate determination in this case, the court need not take up the question whether the entry into the 30th Street apartment was made without identification or notice of the purpose of the entry (see e.g. People v Floyd, supra).
Turning now to the entry into the 48th Street apartment, that of the defendant Mejia, the court finds that probable cause existed to arrest the defendant for conspiracy. But again the basis for lawful arrest pales in light of what was actually done. The defendant was not removed on the basis of a conspiracy charge and arraigned. Rather the evidence adduced reverts to the real objective, to secure the apartment pending arrival of a search warrant. Thus the argument of probable cause appeals to this court more as a subterfuge or technical entry to cover the real purpose based upon the arrest of Sarmiento. For reasons stated above, the exigent circumstances argument by the People is not persuasive. The true purpose of the police is compounded by the fact that the other occupants were also arrested and detained on baseless grounds merely because they happened to be there. The quantity of money in mere plain view was, at the time, in no way possible of association with criminal conduct. It was, in law, as innocent as Tommy Thumbs Pretty Song Book nursery rhyme, "The king was in his counting house counting out his money.”
So we come back to the basic issue. When or for how long *930 may a private dwelling area be internally secured awaiting arrival of a search warrant? We are not dealing with the delay and withholding of an inanimate object until a warrant can be obtained (see e.g., United States v Van Leeuwen, 397 US 249).
Since there is no line of New York State cases on the subject, one must turn to the cases in the Federal field where case law is scarce.
The case of United States v Griffin (502 F2d 959) closely approximates the situation here. Having developed probable cause for seeking a search warrant, police agents went to secure one. But other officers forcibly entered the apartment and secured it pending arrival of the warrant. The entry was made at about 5:00 p.m. and the warrant did not arrive until 9:00 p.m. The prosecution sought to establish right of entry based upon exigent circumstances in that there was danger of destruction of narcotics. The court held against the government claim, indicating that there was no proof that anyone was in the apartment at the time of entry.
Such was the case here in the case of the 30th Street apartment. Although persons were seen leaving the apartment, there is no proof that at the time of entry the defendant Lopez was therein.
There was substantial evidence that the defendant Mejia would be found in the 48th Street apartment and in fact opened the door at the officer’s knock; and as previously stated there was probable cause to arrest Mejia for conspiracy. A similar situation obtained in United States v Phillips (497 F2d 1131). The appellate court posed the question, "Assuming that the agents had probable cause to arrest Phillips, the question then becomes: was the entry into the building a valid entry?”
While the answer could well be in the affirmative if the sole object was to arrest Mejia for conspiracy, the court finds that that was not the true purpose but rather the purpose was to secure the apartment based upon claimed exigent circumstances pending arrival of the warrant.
The court finds that the arrest of Sarmiento did not give rise to the exigent circumstances which made either entry lawful. The police had no knowledge that either apartment contained contraband and no actual knowledge that contraband was being removed from the 30th Street apartment *931 despite observations of a suspicious nature. Had that been the case there might have been probable cause to enter and arrest without a warrant (see United States v Curran, 498 F2d 30).
The case of United States v Rubin (474 F2d 262, 269), is distinguishable. In that case the police had definite knowledge that a statute containing hashish had come through customs and was trailed to defendant’s garage. The police went to seek a search warrant. The defendant Agnes meanwhile emerged from the residence and became aware of police surveillance. He tried to evade the police and when apprehended at a gas station yelled out to the observers, "Call my brother”. This communicative statement created the court-approved exigent circumstances.
It is also worthy to note that in Rubin, the police abandoned their efforts to get a warrant once the entry was made.
The court believes that because and only because of the attempted alert given by the defendant Agnes, did the Rubin court hold as it did.
In the case at bar, the arrest of Sarmiento did not result in any overt act or attempt at communication. That the mere possibility existed in the minds of the police that the arrest might be observed by someone in a position to give warning and that warnings might be given, did not create an exigent circumstance justifying the intrusion.
The motions to suppress as to both the 30th Street and 48th Street apartments are granted.
Having determined as it has, the court need not consider the five- and six-hour delays between entry and arrival of the search warrants nor whether inclusion in the search warrant application of facts regarding the entries affected the decision of the Supreme Court Justice to issue the warrants.
During the course of the hearing, the People introduced evidence tending to show difficulty in presenting the search warrant application to a Judge. The Justice to whom the application would have been made, considering the facts of the long-pending investigation, was not available. The Justice who actually did sign the warrants did so at his home late at night. This the court finds irrelevant. Officer Ramos’ testimony is that the papers were not completed until about 10:00 p.m., long after the entries had been made. Had an issuing Judge been immediately present when the last required docu *932 ment was complete, it would not affect the court’s determination as here made.