**UNITED STATES of America,**

v.

**Rev. Alberto MEJIAS et al., Defendants.**

**No. 76 Cr. 164.**

United States District Court,
S. D. New York.

June 11, 1976.

---

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., by Michael Q. Carey, Nathaniel H. Akerman, Asst. U. S. Attys., New York City, for the U. S.

John A. Ciampa, New York City, for defendant Rev. Alberto Mejias.

Federal Defender Services Unit by Jack Lipson, New York City, for defendant Manuel Francisco Padilla Martinez.

Herbert Olan Brown, Brooklyn, N. Y., for defendant Francisco Cadena.

Jerome Allan Landau, New York City, for defendant Alba Luz Valenzuela.

## OPINION

ROBERT L. CARTER, District Judge.

### I

On September 3, 1974, defendants Alberto Mejias, Alba Luz Valenzuela, Francisco Salazar and Francisco Padilla [1] were arrested at approximately 5:20 p. m. in apartment 1B at 445 West 48th Street where Mejias resided. Roughly some five hours later, a search warrant was brought to the apartment and a search of the premises and a personal search of the defendants took place. During the intervening five hours between defendants' arrest and the arrival of the search warrant, defendants were held at the apartment in the custody of the arresting officer, Detective Vincent Palazotto, of the New York City Police Department. During that interval, no personal search was made of the defendants, except to pat them down to ascertain whether they were armed, and no search was made of the apartment, except a walk-through and cursory look into the bathroom, kitchen and open closets to determine whether there were other persons in the apartment.

▮ The defendants were arrested without warrant. The issues then are whether the entry into the apartment, the arrest of Mejias and of the other defendants, and the subsequent search of the apartment after the warrant arrived violated Fourth Amendment strictures requiring that all the evidence seized on the person of the defendants and in the search of the apartment be suppressed. Defendants cite and rely upon *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *Jones v. United States*, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958); and *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), but these cases deal with a warrantless entry and search of a private dwelling. They are not dispositive

1. The defendant Padilla's name is listed in the indictment as Francisco Padilla Martinez and Francisco Salazar is named in the indictment as Francisco Salazar Cadena, but we have been advised at trial that the correct surnames are as indicated *supra*.

of the issue raised here. No blanket rule has been announced governing the warrantless entry into a private home to arrest persons therein. That issue was left open in *Jones*, and such entry for purposes of arrest was assumed to be valid in *Coolidge*. Nor has the question been squarely met by our Court of Appeals, *see United States v. Mapp*, 476 F.2d 67, 73–74 (2d Cir. 1973). Each case seems to turn on its facts—whether the police officer had reasonable cause to seek entry into the dwelling to make an arrest at the time in question. *See United States v. Mapp, supra.* I must, therefore, determine whether on the undisputed facts adduced on this record Palazotto was justified in seeking entry into Mejias' apartment to arrest him on September 3, 1974, and whether once inside the apartment, the arrest of the other defendants was consonant with federal legal and constitutional standards.

Before proceeding to that analysis, let me deal first with several threshold issues. The pat-down of the defendants by Palazotto on entry into the apartment to determine whether they were armed, *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), and the look through the apartment to determine whether any persons were in the apartment was reasonable, prudent conduct and, indeed, essential to insure the safety of the law enforcement officers. *See Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). █ The seizure of the evidence which defendants seek to have suppressed was held invalid under New York law. *People v. Salazar*, 83 Misc.2d 922, 373 N.Y.S.2d 295 (Sup.Ct., N.Y.Co.1975). Defendants' reliance on the state court determination as controlling in respect of their motion in this court, however, is surely misplaced. The admissibility of evidence in a federal criminal trial must be tested by federal law, *United States v. Burke*, 517 F.2d 377, 382 (2d Cir. 1975), and in this instance what must be determined is whether the requirements of the Fourth Amendment have been met. *United States v. Bedford*, 519 F.2d 650, 654 (3d Cir. 1975). That determination must be made independent of and apart from what has been decided as mandated by state law.

II

Detective Palazotto was a member of a state-federal dangerous drug enforcement enterprise seeking to apprehend those persons involved in the importation, sale and distribution of narcotics in the New York City area. In the course of this law enforcement effort, Esmerida Sanchez, the maid of defendants, Estella and Mario Navas,[2] and one Lilia Prada were arrested on January 31, 1974, for selling narcotics to undercover agents. The two women decided to cooperate with law enforcement authorities and became informers. The telephone of Mario Navas was tapped, as was that of one Mono, another suspected narcotics dealer. Through Prada and Sanchez controlled buys of cocaine were made from Navas. During the course of the investigation and pursuant to surveillance of Mono and Navas and the wiretap of their telephones, law enforcement authorities were given good cause to suspect that the defendant Mejias was working with Mono and Navas in the sale and distribution of drugs.

Between February, 1974, and September, 1974, several conversations between Mono and Mejias and Navas were overheard, which police had reason to believe concerned the sale and distribution by Mejias of narcotics. Mejias was often seen in the company of these two men, sometimes entering and leaving their apartments. At one point, Sanchez told the police that Mejias and Navas had arrived at the latter's apartment carrying a number of containers labelled "milk," and that Navas kept two of the containers and Mejias took the rest. Sanchez provided samples from the containers to the police, and laboratory testing showed the substance to be milk sugar.

---

**2.** Estella and Mario Navas are on trial with Mejias, Valenzuela, Salazar and Padilla, but are not parties to this motion.

She also reported Navas as having guns in his possession.

Among Palazotto's responsibilities was the reading of all the reports of surveillance, all synopses and all running summaries of wiretapped conversations made or secured in the investigation. From these various reports, synopses and summaries, he would extract information which he believed of particular value for his superiors. He, therefore, was familiar and conversant with all the information which had been gleaned in the investigation through surveillance and overheard wiretapped conversations and reports from informers during 1974 and before. He was on vacation during the month of August, 1974. He came in several times during August to pick up his pay check, and on those occasions he reviewed whatever additional reports, synopses or summaries that had accumulated in his absence. On September 3, 1974, he returned to work from vacation and reviewed all the reports, synopses and running summaries of over-heard conversations for the period August 28–September 2.

In an overheard conversation between Navas and Mejias on August 31, 1974, the sale of a kilogram of cocaine for $22,785 was discussed, and the two discussed meeting later that night at 7 or 7:30 p.m. He also read a synopsis of a call later on August 31 between Mono and Mejias in which Mono inquired whether Mejias had seen Botallan, and Mejias asked Mono whether Navas was coming over.

Early in the day on September 3, 1974, Detective Manning was on surveillance at Mejias' residence, and he reported seeing Navas and Mejias meeting in front of the building where Mejias lived; that Navas was carrying a red shopping bag with white handles; that both had entered the building and a short time later had come out of the building. When they came out Navas was no longer carrying the shopping bag.

After reviewing the various reports, summaries and synopses referred to and having received Manning's report of Mejias and Navas meeting, Palazotto, at 2:30 p.m. on September 3, himself took up surveillance outside Mejias' apartment. Shortly after assuming surveillance, Palazotto was authorized by his superiors to arrest Mejias if he saw fit.

At about 4:45 p.m., while still on surveillance of Mejias' apartment, Palazotto saw a cab pull up in front of the building—445 West 48th Street—and a man and woman carrying boxes alighted from the cab and entered the building. It was raining and his vision was somewhat obstructed, but he recognized Mejias when he too stepped out of the cab and followed the others into the building. He decided then to arrest Mejias.

He and three other officers entered the building. While one stayed in the lobby covering the front door of Mejias' apartment, Palazotto and the two other officers went up on the roof to determine whether there was a backdoor exit from Mejias' apartment. While there they were accosted by the building superintendent who expressed hostility and resentment concerning their interest in Mejias after being advised of their identity. Palazotto and one of the two officers with him came downstairs to the lobby leaving one officer on the roof. When he reached the lobby, Palazotto advised his fellow officers that he was going to arrest Mejias.

One officer rang the outside bell to apartment 1B. Palazotto stood outside the door. He heard the buzzer releasing the lock on the lobby door and footsteps inside the apartment approaching the door. He knocked on the door, heard a voice speaking as if in greeting. The door was opened to the width of a chain secured on the inside, and he saw Mejias through the opening. Palazotto identified himself, showed Mejias his detective shield and told him that he was under arrest. Mejias retreated from the opening of the door back into the apartment beyond Palazotto's vision. When Palazotto could no longer see Mejias, he with the help of the other officer, pushed the door open by force.

When the door opened, Palazotto saw Mejias backing away, Valenzuela, Salazar and Padilla, the other defendants, in the act of rising from a bed on which he could see

piles of money, a red shopping bag, a brown bag and pieces of cardboard. Salazar and Padilla had money in their hands. Palazotto grabbed Mejias, holding the latter in front of him as a shield and pointing his gun at the others, he told them to "freeze." He then told everyone to move over against the wall. Valenzuela appeared not to understand, and Palazotto approached the bed to get her to move. As he moved towards her and closer to the bed, he was able to read on the cardboard the name Mario, opposite of which was the figure $22,765 and the name Mono with dollar figures beside that name. He made everybody stand up against the wall, patted them down for weapons, made a run-through of the apartment as previously indicated to make sure no one else was on the premises, advised his superiors of what he had done and was told to keep the place secure. He then advised Salazar and Padilla, who appeared to understand English, of their rights.

He entered the apartment at about 5:20 p.m.; a search warrant arrived at about 10:30 p.m. Prior to the arrival of the search warrant, no search of the premises was made except to look at what could be seen in open view. When the warrant arrived, a thorough search was made and quantities of cash, cocaine and paraphernalia connected with narcotics business were found.

### III

■ There certainly was ample grounds for arresting Mejias. The investigation—surveillance and overheard conversations—gave the police and Palazotto in particular good cause to believe that Mejias was engaged with Navas and Mono in the importation, sale and distribution of narcotics. There is no doubt that as a result of their investigation that Mejias' arrest on sight was justified. *Ker v. California*, 374 U.S. 23, 34–35, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). The question in re Mejias narrows to whether Palazotto was justified at the time in entering Mejias' apartment to arrest him without first securing a warrant.

I think he was. Prior overheard conversations and surveillance gave Palazotto a firm basis for concluding that Mejias was trafficking in drugs. The most recently overheard conversation of August 31 of Navas and Mejias about the sale of a kilo of cocaine, a synopsis of which Palazotto had read after his return to work, the report earlier on September 3 of the presence of Navas at Mejias' apartment with a shopping bag which apparently was left in the apartment and the subsequent return of Mejias and others to the apartment carrying boxes, gave Palazotto good grounds to believe that Mejias was engaged in criminal activity in the apartment. *See United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). He had a right to seek entry into the apartment, therefore, to arrest Mejias. *United States v. Mapp, supra*. While, as indicated earlier, the legality of a warrantless arrest inside an apartment has not been completely resolved, here the circumstances facing the police fully justified the decision to move in and arrest Mejias. Moreover, this was not a late-at-night entry when the police had reason to believe the defendant was asleep and there is patently ample time to secure a warrant before morning. The time when Palazotto sought to enter the apartment to make the arrest was roughly 5:10 to 5:20 p.m. It was early September and at that time of day there is still several hours left of daylight and it is considerably earlier than normal bedtime hours. Moreover, Palazotto had every reason to believe, as a result of the investigation, that Mejias was a foreigner, with no roots or ties to this country, and while there was no specific indication of Mejias' imminent flight, none was needed. Mejias had the capability of instantaneous flight. Thus all the circumstances justified Palazotto's decision to make the arrest at once.

When Palazotto knocked on the door, identified himself and announced his purpose, he then was entitled to break into the apartment to arrest Mejias when he backed away from the door and moved out of sight. *Miller v. United States*, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958). Palazotto

at that point did not know what Mejias or his companions would do; they could have been armed. His break-in was fully justified.

On entering the apartment, seeing the piles of money on the bed, the defendants caught as if in the act of counting money, the red shopping bag which earlier Navas, a known narcotics dealer, had been seen carrying into the apartment and then on coming closer to the bed, seeing in plain view[3] the cardboard with the name Mario and $22,765 beside it, which he related to conversations between Mejias and Navas about the sale of one kilo of cocaine for $22,765, he had probable cause to detain the other defendants as being involved in a narcotics conspiracy. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■ There is nothing to indicate that the entry was a subterfuge to effectuate a search. Indeed, no search was made until after the arrival of a search warrant. That after the arrest the parties were not taken immediately to the police station and booked is violative of state law, *New York Criminal Procedure Law*, § 140.20, *People v. Salazar, supra*, 373 N.Y.S.2d at 301, but the failure of the police to follow the dictates of New York law in that regard does not render lawfully seized evidence inadmissible in a federal trial. What governs here are the Fourth Amendment requirements, *United States v. Armocida*, 515 F.2d 49, 52 (3d Cir. 1975), and they were fully met.

Accordingly, the motion to suppress the evidence seized on September 3, 1974, from the persons of Mejias, Valenzuela, Salazar and Padilla and from the apartment Mejias occupied is denied.

SO ORDERED.

---

**3.** *Coolidge v. New Hampshire*, 403 U.S. 443, 465–66, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).