**UNITED STATES of America, Appellee,**

v.

**Donald HEAD, a/k/a "Mr. Don", and
Bruce Wheaton,
Defendants-Appellants.**

**Nos. 217, 261, Dockets 76–1249, 76–1271.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 1, 1976.

Decided Nov. 29, 1976.

Irving Perl, New York City, for defendant-appellant Head.

Arnold M. Cowan, Redondo Beach, Cal. (Abraham Solomon, New York City, of counsel), for defendant-appellant Wheaton.

Federico E. Virella, Jr., Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, Paul Vizcarrondo, Jr., Asst. U. S. Atty., New York City), for appellee.

Before FEINBERG, GURFEIN and VAN GRAAFEILAND, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

In January of 1976, Jack Taylor, an undercover agent with the Drug Enforcement Administration, had several telephone conversations with Boonsak Phuvasitkul, a resident of Thailand, concerning the proposed purchase of a unit of heroin which would be mailed from Thailand to the United States through the United States Air Force postal system. Events which followed rapidly thereafter led to the arrest and conviction of appellants on one conspiracy count of manufacturing, importing and distributing heroin, one substantive count of importing and one of distributing heroin. Although appellants were tried separately, their appeals were heard together. Phuvasitkul, who was also indicted, pleaded guilty to the second substantive count and another count on which appellants were not tried, and testified as a government witness.

The government's proof established that appellant, Head, a staff sergeant stationed at the air mail terminal at Don Muang Airport outside Bangkok, was the key man in the smuggling operation. As chief supervisor of a shift, Head was responsible for the receiving, dispatching and inspecting of all incoming and outgoing mail, and he had developed a method of packaging heroin for mailing so that it would escape detection by dogs or x-ray.

At a meeting with Phuvasitkul in Bangkok on February 4, 1976, Head agreed to mail a unit of heroin to New York. The package was mailed to a post office address in New York City where it was seized by a DEA agent. Analysis showed the contents to be 638 grams of heroin. While en route to the United States to pick up the money for the heroin which had been mailed, Phuvasitkul met Agent Taylor, acting in an undercover capacity, in Toronto, where arrangements for payment were discussed. Phuvasitkul told Taylor at that time that Head had also mailed two or three units to appellant Wheaton and that Phuvasitkul was to contact Wheaton with instructions for making payment. Upon his arrival in New York, Phuvasitkul was placed under arrest. Several weeks later, Wheaton was arrested in California.

■ In arguing for reversal of his conviction, Head makes the now routine claim of a single conspiracy charged and multiple conspiracies proven, and also contends that unfair comments were made by both judge and prosecutor. Neither contention merits extended discussion. Appellant did not request a charge on multiple conspiracies, took no exception to the charge as given, and comes ill-equipped to this Court asserting error. *See United States v. Indiviglio,*

352 F.2d 276, 280 (2d Cir. 1965), *cert. denied,* 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966). Moreover, because he makes no showing of prejudice resulting from the asserted multiplicity, his argument is unpersuasive. *See United States v. Sir Kue Chin,* 534 F.2d 1032, 1035 (2d Cir. 1976).

■ Some strong comments were made by the trial judge which would have been better left unsaid. However, in view of the overwhelming proof of Head's guilt, we do no more than express our disapproval of what was said. Appellant found no fault with the prosecutor's summation when it was given. *See United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 238–39, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). We think his initial reaction was correct.

Head's only claim of any substance arises out of the seizure of a package containing $26,800 in currency at the time of his arrest in Bangkok. Pursuant to 39 U.S.C. § 406, the Don Muang airmail terminal was under the supervision and control of the air force, which had established written procedures for customs examination of official and personal mail. Among these was a provision that fluoroscopy would be used by military postal personnel as directed by the military department which operates the post office. As one of the persons responsible for making such inspections, appellant must have been aware that fluoroscoping was routinely being done.

On March 9, 1976, Head's commanding officer was informed by the air force Office of Special Investigations that a person fitting Head's description was believed to be involved in narcotics trafficking. A registered parcel addressed to Head was examined under a fluoroscope, and the parcel showed outlines of what appeared to be stacks of currency. After Head had picked up this package on the following day, he was placed under arrest with the package in his possession, pursuant to a complaint which had, in the meantime, been filed against him in New York. At the request of OSI, a search warrant was issued by the Commanding Officer for Air Force Personnel as authorized by chapter 152 of the Manual for Courts Martial, following which the package was opened and the currency found. Appellant asserts that his motion to suppress this evidence as the product of an illegal search was improperly denied.

■ In view of the strength of the government's case against Head, consisting among other things of extremely incriminating taped conversations, appellant is asserting what, at most, would be harmless error. *United States ex rel. Stanbridge v. Zelker,* 514 F.2d 45, 52 (2d Cir.), *cert. denied,* 423 U.S. 872, 96 S.Ct. 138, 46 L.Ed.2d 102 (1975); *United States v. Anderson,* 500 F.2d 1311, 1318–19 (5th Cir. 1974). In actuality, there was no error at all. Head's constitutional right of privacy must be measured by whether he had an expectation of privacy which society was prepared to recognize as reasonable. *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Because "the military is, by necessity, a specialized society separate from civilian society", *Parker v. Levy,* 417 U.S. 733, 743, 94 S.Ct. 2547, 2555, 41 L.Ed.2d 439 (1974), and there are serious drug problems in military installations, *see Schlesinger v. Councilman,* 420 U.S. 738, 760 n. 34, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975), the limited invasion of privacy in the fluoroscoping, which must have been anticipated by appellant, was not constitutionally objectionable. *See Committee for GI Rights v. Callaway,* 171 U.S.App.D.C. 73, 518 F.2d 466, 474–77 (1975); *cf. United States v. Edwards,* 498 F.2d 496, 499–501 (2d Cir. 1974). Moreover, the opening and search of the offending package did not take place until after a valid search warrant had been issued by the commanding officer. Appellant's motion to suppress the money found in the search was properly denied.

Appellant Wheaton had also been a member of the United States Air Force and was stationed in Thailand from January 1972 until January 1973. When Phuvasitkul met with Taylor in Toronto, he showed Taylor a piece of paper with Wheaton's name and address on it and stated that while he was in the United States he was going to try to

collect from Wheaton moneys owed to an individual who was the supplier of drugs in Thailand. Phuvasitkul also had in his possession the national identity card of the drug supplier so that he would be able to identify himself to Wheaton.

Subsequent to Phuvasitkul's arrest, he said that he had been told by his supplier that Wheaton had returned to Thailand in February and had purchased two or three units of heroin which were being mailed to the United States by Head. A telephone conversation between Phuvasitkul and his supplier, taped by the DEA on March 9, 1976, established that Wheaton had left Thailand and that two units of heroin had been mailed to him. Following up on this information, the government intercepted a letter from the supplier to Wheaton dated March 8, 1976 stating that one-half unit, 300 grams, of heroin was being assigned to him. The government also established that Wheaton was in Thailand between February 23, 1976 and March 5, 1976 where he was registered at the Chavalit Hotel in Bangkok.

Following his arrest, and at the suggestion of DEA, Phuvasitkul made a taped telephone call to Wheaton, telling him that the two units of "merchandise" had been sent to Phuvasitkul by the Thailand supplier and that he had been instructed to call Wheaton whose number had been given to him by the supplier. Wheaton, who was then living in California, said he didn't know whether he would be able to help Phuvasitkul and that he would get back to him, because he was not going to be in New York for a while. Wheaton took Phuvasitkul's telephone number and agreed to call him back that night. Wheaton also agreed that, if he took the two units, he would send the money for them directly to the supplier in Thailand. Phuvasitkul asked Wheaton how much he thought he could sell the drug for, and the reply was, "I don't know, man. I don't know. Don't ask me the question on the phone, man."

■ Wheaton's contention that there was insufficient proof of his participation in the conspiracy and that hearsay statements of his alleged co-conspirators should not have been admitted into evidence must be rejected. Proof of the existence of the conspiracy to import heroin could be, and was, established without reference to any acts of Wheaton. *United States v. Araujo,* 539 F.2d 287, 289 (2d Cir. 1976). This being so, it was for the trial judge to determine whether Wheaton's participation in the conspiracy was established by a fair preponderance of independent evidence before the hearsay statements of his co-conspirators could be used against him. *United States v. Wiley,* 519 F.2d 1348, 1350 (2d Cir. 1975), *cert. denied,* 423 U.S. 1058, 96 S.Ct. 793, 46 L.Ed.2d 648 (1976). We are not prepared to say that the trial court erred in holding that the government's proof met this test.

■ The admissions made by Wheaton in his taped conversation with Phuvasitkul were made during the course of the alleged conspiracy, rather than after its consummation, and may be sufficient to establish Wheaton's guilt even without corroboration. *Buford v. United States,* 272 F.2d 483, 486 n. 1 (9th Cir. 1959). However, if corroboration was required, it was there. A conspiracy had been shown to exist. Phuvasitkul's "verbal act" testimony that he had come to the United States to collect money from Wheaton, while not admissible to establish that money was owed, was admissible to explain his presence in the United States and set the background for his telephone call. *United States v. Nuccio,* 373 F.2d 168, 173 (2d Cir.), *cert. denied,* 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed. 623 (1967). The presence of Wheaton in Thailand during the week preceding the call became significant after the statements made by Wheaton on the telephone. The letter from the drug supplier to Wheaton, omitting any reference to its contents, supported the inference that there was some relationship between them. *United States v. Panebianco,* 543 F.2d 447, 456–457 (2d Cir. 1976); *United States v. Ruiz,* 477 F.2d 918, 919 (2d Cir. 1973), *cert. denied,* 414 U.S. 1004, 94 S.Ct. 361, 38 L.Ed.2d 240 (1974).

■ When, as in this case, the existence of a conspiracy has been shown, evi-

dence sufficient to link another defendant with it need not be overwhelming, *see United States v. Marrapese,* 486 F.2d 918, 921 (2d Cir. 1973), *cert. denied,* 415 U.S. 994, 94 S.Ct. 1597, 39 L.Ed.2d 891 (1974), and it may be circumstantial in nature. *United States v. Manfredi,* 488 F.2d 588, 596 (2d Cir. 1973), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974). Examining the evidence below in the light most favorable to the government, as we are required to do, *United States v. Marrapese, supra,* 486 F.2d at 921, we think it was sufficient. This being so, testimony as to the acts and statements of Wheaton's co-conspirators in furtherance of the conspiracy, which we need not recount herein, was properly admitted into evidence. Under *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), Wheaton also became responsible for the substantive illegal acts of his co-conspirators, done in furtherance of the conspiracy, even though he may not have participated directly in them.

Finding no reason to disturb the jury's verdict on either trial, the judgments of convictions are affirmed.