**UNITED STATES of America, Appellee,**

v.

**Rev. Alberto MEJIAS, a/k/a Rev. Angel Ortiz, et al., Defendants-Appellants.**

Nos. 562–566, 609–610, Dockets 76–1384 to 76–1389, 76–1395.

United States Court of Appeals, Second Circuit.

Argued Jan. 20, 1977.

Decided March 10, 1977.

Michael Q. Carey, Asst. U.S. Atty., New York City (Robert B. Fiske, Jr., U.S. Atty., S.D.N.Y., Nathaniel H. Akerman, Frederick T. Davis and Audrey Strauss, Asst. U.S. Attys., New York City, on the brief), for appellee.

Ivan S. Fisher, New York City, for appellant Francisco Salazar Cadena, and John A. Ciampa, New York City, for appellant Rev. Alberto Mejias (Jeffrey D. Ullman and Edward M. Chikofsky, New York City, on the brief).

Jonathan J. Silberman, New York City (William J. Gallagher, The Legal Aid Society, Federal Defender Services Unit, New York City, on the brief), for appellant Manuel Francisco Padilla Martinez.

Stuart R. Shaw, New York City, for appellant Henry Cifuentes-Rojas.

Donald E. Nawi, New York City, for appellants Estella Navas, Mario Navas and Jose Ramirez-Rivera (Howard L. Jacobs, New York City, on the brief for appellant Estella Navas, Stokamer & Epstein and Michael P. Stokamer, New York City, on the brief for appellant Mario Navas, Abraham Solomon, New York City, on the brief for appellant Jose Ramirez-Rivera).

Before LUMBARD and FEINBERG, Circuit Judges, and COFFRIN, District Judge.*

LUMBARD, Circuit Judge:

Alberto Mejias, Mario Navas, Estella Navas, Henry Cifuentes-Rojas, Jose Ramirez-Rivera, Manuel Francisco Padilla Martinez and Francisco Salazar Cadena appeal from convictions and sentences entered July 30, 1976 after a five-and-one-half week jury trial before Judge Carter in the Southern District. All appellants were convicted of conspiring to violate the federal narcotics laws between 1973 and 1974. Mario and Estella Navas, Mejias and Rojas also were convicted of substantive narcotics offenses.[1] Judge Carter sentenced each appellant to fifteen years' imprisonment on the conspiracy count, and imposed various concurrent and consecutive terms on those convicted of substantive counts.[2]

All appellants allege a violation of their speedy trial rights. Most urge that pre-indictment delay resulted in a violation of due process. In addition, Padilla, Mejias, Salazar and Rojas contend that their motions to suppress evidence seized after their arrests were improperly denied. Ramirez disputes the legal sufficiency of the evidence against him. Padilla maintains that certain documents seized on his person were improperly admitted into evidence. Mejias and Salazar complain of prosecutorial misconduct; and all appellants charge that the sentences imposed constituted an abuse of the trial judge's discretion. We find these assertions insubstantial and affirm.

The record discloses that appellants were members of a massive international narcotics organization which smuggled hundreds of kilograms of cocaine into the United States from Colombia, South America for distribution primarily in New York City. The organization was multitiered, with various members at different levels of command. It was represented in the United States primarily by its importers, with couriers slipping in and out of the country for the purpose of smuggling cocaine and marijuana. Narcotics were brought into New York directly from South America, and indirectly through Florida, Central America, Germany and Canada. Much of it arrived hidden in false-bottom shoes and suitcases, hollowed-out coat-hangers and double-lined girdles and brassieres.

As a result of an intensive cooperative investigation by federal and state authorities, appellants were arrested by state authorities in late 1974. Their arrests on federal charges occurred in February 1976. The government's case consisted primarily of surveillance conducted between January and October 1974, over 150 wiretapped telephone conversations, evidence seized at the residence or warehouse ("stash") apartments of various of the appellants, and the testimony of various witnesses, including New York City Police Detective Luis Ramos, the undercover officer who infiltrated the organization, and Detective Vincent Palazzotto, the officer who arrested Mejias, Padilla and Salazar.

A summary of the highlights of the evidence presented by the government demonstrates overwhelmingly the complicity of the appellants. Most of the group used false passports to enter the country,[3] and other false identification to lease apartments, list telephones and rent automobiles. Conversations between members were laced with references to "clothing," "bibles," "music" and "children," which the jury

---

* Sitting by designation.

1. The jury disagreed as to an eighth defendant, Alba Luz Valenzuela, and, subsequently, the indictment against her was dismissed. Of the two defendants not tried, Antonio Lopez was a fugitive, and Juan Guillermo Mesa was in custody in Italy pending extradition.

2. On the conspiracy count, each appellant, except Salazar, was credited with time spent in state custody following the state arrests. Those appellants, except Rojas, convicted on substantive counts were charged with this state-served time, resulting in net fifteen-year sentences.

3. Of the appellants, only Padilla had entered the United States lawfully and was a legal resident alien.

could find were commonly understood code words for the cocaine in which the members were dealing. Continuous operations of the enterprise were financed by large portions of the narcotics proceeds, much of which was transmitted to Colombia by money orders.

Infiltration of the organization occurred in 1973 when Detective Ramos arranged a series of cocaine purchases from Lilia Prada, named as an unindicted co-conspirator in the indictment.[4] By means of a wiretap installed on Prada's telephone, Mario Navas was identified as the source of the drugs; and with Prada's cooperation after her arrest, a meeting was arranged on February 5, 1974 between Ramos and Mario Navas at which a sale of one quarter kilogram of cocaine for $6,400 was consummated, and a 3 kilogram sale, subsequently aborted for lack of funds, was proposed.

Mario Navas, like Mejias, was profiled in the government's case as an importer, who directly and through underlings did his own wholesaling. Unlike Mejias, who referred to himself as a priest and lived for a time in a convent while he maintained a separate apartment for his narcotics business, Mario Navas lived with his wife Estella in a series of apartments in Queens. Throughout 1974, surveillances and recorded conversations established that, in addition to his residence, Mario Navas maintained three stash apartments in Queens. On April 17, 1976 at one such apartment, Toto and Jero, two members of the organization, were arrested by officers of the Immigration and Naturalization Service, and narcotics and drug-related paraphernalia, along with $2,700 cash and miscellaneous papers, were seized.

Estella Navas handled her husband's business in his absence, attended various meetings and relayed messages to and from contacts in Germany and South America. She also controlled sales in her own right.

On one occasion, after an arrest of one courier and a delay in the departure of another from Colombia had combined to thwart an expected cocaine shipment, the Navases purchased a minimal supply of one-half kilogram from another source. Following the pickup from the substitute supplier, Estella was seen entering one of the Queens stashes carrying a shoulder bag, accompanied by Mario in shirt sleeves, who was empty handed.

The government additionally showed that Francisco Armedo-Sarmiento, commonly known as Mono, an unindicted co-conspirator[5] and an importer for whom Rojas and Ramirez worked as wholesalers, was a key figure in the conspiracy. During the time that the Navases were moving large quantities of cocaine, Mejias and Mono were similarly engaged, usually independent of one another, but occasionally with each other's assistance. Conversations intercepted on Mono's telephone in May 1974 established that Mejias purchased cocaine from Mono on at least one occasion, and that the two men had received narcotics from Colombia for which Mono had sent money to South America. Wiretap evidence also demonstrated that various members of the conspiracy used each other's apartments to conduct their business; for example, Mario Navas used Mono's telephone to discuss a narcotics shipment with Mono and a Spanish contact, Rojas used Mono's telephone to place a call for Mono to Colombia, Mono contacted Ramirez from the Navas telephone to set up a meeting to turn over narcotics proceeds, Salazar gave Mejias' address as his own when opening a bank account upon his arrival in New York, and Salazar and Padilla were arrested, along with Mejias, in Mejias' apartment, apparently in the midst of counting narcotics proceeds.

Rojas used an apartment at 327 West 30th Street in Manhattan to store narcotics

---

4. Prada fled at some point prior to trial and is presently a fugitive.

5. Mono and eleven co-conspirators were convicted of conspiracy to violate the narcotics laws in *United States v. Bravo, et al.*, after a fourteen-week jury trial before Judge Cannella in the Southern District. We affirmed the conviction of Mono and eight others in *United States v. Sarmiento*, 545 F.2d 785 (2d Cir. 1976).

distributed for Mono. On August 29, 1974 Rojas and Mono received a telephone call in that apartment from Mario Navas, who placed an order for narcotics which he and Estella picked up that evening.

Ramirez's participation as a wholesaler was primarily evidenced by several telephone conversations on the first three days of September 1974 in which he and Mono planned to meet, first at the 30th Street apartment, and then at a location in Queens, to permit Ramirez to deliver $10,-000 in narcotics proceeds. They spoke of previous payments and of Mono's preference for money orders as a medium of payment. Ramirez was instructed as to which banks to use and what denominations to obtain. His knowledge of the organization and involvement therein was reflected by his informing Mono that he had taken some of Rojas' allotment of narcotics to service his customers. At the time of his arrest on September 3, 1974 in Queens, Ramirez was en route to meet with Mono and had ten blank $1,000 money orders from various banks, as well as a card listing Rojas' telephone number, in his possession.

Mejias kept a safe deposit box in a bank near his residence. When the box was seized in September 1974 it contained $26,-700 in cash and records showing large deposits, totalling some $36,700, regularly made in May, July and August. Additional records recovered from Mejias' apartment at the time of his arrest evidenced at least three trips to Miami, Florida in 1974—one prior to June 6, another in July, and a third in August. On the last trip, Mejias met with Salazar, and the two men returned together to New York. Salazar checked into the Skyline Motor Inn, on Tenth Avenue in Manhattan, where Padilla then resided. Salazar was identified in the government's case as the source of Mejias' cocaine; Padilla as Mejias' financier.

The Skyline Motor Inn was the scene of a series of meetings between various of the appellants at the end of August 1974. Mejias was seen there on August 29; on the following day, Padilla arrived with Mono and Mario Navas, followed by Mejias who later departed with Padilla. Records seized from Mejias' apartment showed accounts for that day totalling $58,500 and identifying, in three separate transactions, customers other than the co-conspirators with whom Mejias had met.

Additionally, recorded conversations indicated that on August 31 Mario Navas delivered $22,785 to Salazar as partial payment for two kilograms of cocaine. Later that day, Salazar departed for Miami, and Mejias and Mario Navas spoke about that payment, as well as an additional expected payment of $11,400. During Salazar's absence, the use of the motel room continued; Padilla was seen entering with a brown attache case. After his arrest in Mejias' apartment on September 3, 1974, police seized an identical case containing $31,525 from the room.

Salazar returned to New York on September 2, 1974. Early the following day, Mario Navas delivered $11,750 in a red plastic bag to Mejias as an additional payment for the previously purchased cocaine. Records recovered from Mejias' apartment showed that sales on September 2 alone totalled $273,450 for fifteen kilograms of cocaine purchased in differing quantities, not only by Navas, but also by Rojas and Ramirez, among others. Padilla's interest in those sales was substantiated by his possession of virtually identical records at the time of his arrest on September 3, 1974 in Mejias' apartment, some hours after Mario Navas had delivered the red plastic bag. Mejias and Salazar also were arrested at that time. Cash found in seven locations around the apartment totalled $108,149. In the trash can can were fourteen empty bags, each of which contained cocaine residue. Cocaine-related equipment, in the form of lactose, plastic baggies and a heat sealer, was found in the kitchen cabinets.

None of the appellants took the stand; and only two offered any evidence. Apparently attempting to show the source of his money, Padilla introduced a copy of a check for $50,000 which he had deposited in his checking account in March 1974, after winning that amount in the New York State

Lottery. Rojas attempted to rebut the testimony of government witnesses who identified him as being present at Mono's residence and at the 30th Street apartment.

SPEEDY TRIAL AND PRE–INDICT-MENT DELAY

Appellants claim that, notwithstanding that their federal arrests did not take place until February 19, 1976, their federal speedy trial rights under Rule 5 of the Southern District Interim Plan pursuant to the provisions of the Speedy Trial Act of 1974,[6] the Sixth Amendment and Rule 48(b), Fed.R.Crim.P., attached on September 3 and October 4, 1974, the dates of their respective arrests by New York police on state charges. Since the trial of this case did not commence until May 24, 1976, appellants contend that their speedy trial rights were violated.[7] We disagree.

On May 14, 1974, after learning that certain targets of an ongoing New York City Police Department street investigation into the distribution of narcotics were also targets of an existing federal investigation, Frank Rogers, Special Assistant District Attorney, Office of Prosecution, Special Narcotics Courts ("the New York City Prosecutor"), convened a meeting in his office with representatives of the United States Attorneys' Offices of the Southern and Eastern Districts, the New York City Police Department, and the Drug Enforcement Administration of the United States Department of Justice, to coordinate the investigations. It was agreed that the ongoing street investigation would take precedence over the federal investigation, that the New York City Prosecutor would prosecute those persons charged with substantive offenses as well as any co-conspirators it elected to prosecute that co-conspirators not so prosecuted would be prosecuted federally, and that the timing of any arrest was to be cleared first with the New York City Prosecutor. A formal agreement to this effect was entered into on September 19, 1974, which designated those persons who would be federally prosecuted, and those who would be charged in the state court. Appellants were then in the latter category.

The appellants were arrested on state charges on September 3 and October 4, 1974 and were taken into state custody.[8] Although Special Agents of the Drug Enforcement Administration were present at each of the arrests, their roles were limited to assisting the New York City police officers in charge. The decisions to make the arrests were made by Lieutenant Michael O'Shea of the New York City Police Department and were approved by Lawrence Herrmann, Assistant District Attorney, New York County.

In June 1975, after New York State had returned indictments against the appellants, a motion was made by Mejias, Padilla, Salazar and Rojas, among others, to suppress evidence seized at Mejias' and the 30th Street apartments. This motion was granted on September 24, 1975 by a Justice of the New York Supreme Court. *People v. Salazar,* 83 Misc.2d 922, 373 N.Y.S.2d 295 (Sup. Ct. N.Y. Co. 1975).

While the state court proceedings were pending, those persons designated under the prosecutorial agreement for federal prosecution were indicted by a federal Grand Jury in *United States v. Alberto Bravo, et al.* Trial of this indictment commenced on October 20, 1975 before Judge Cannella and a jury in the Southern District. At its conclusion on January 23, 1976,

---

6. Rule 5, effective September 29, 1975, was identical to Rule 4 of the Southern District Plan for Achieving Prompt Disposition of Criminal Cases, effective April 1, 1973. See Rule 50(b), Fed.R.Crim.P. Since July 1, 1976 the Southern District Plan for Prompt Disposition of Criminal Cases promulgated pursuant to the Speedy Trial Act of 1974, 18 U.S.C. § 3161, *et seq.* has governed criminal prosecutions.

7. These assertions were the subject of a well-reasoned opinion by Judge Carter, denying defendants' motion to dismiss the indictment. *United States v. Mejias, et al.,* 417 F.Supp. 585 (S.D.N.Y. 1976).

8. Although Estella and Mario Navas claim that following their arrests on October 4, 1974 they were federally detained overnight, they too were taken into state custody and arraigned only on state charges.

the government initiated the federal Grand Jury investigation which culminated in the filing, on February 19, 1976, of an indictment in this case. This investigation was conducted because the ability of the state authorities to prosecute appellants successfully had been jeopardized by the state court's granting the motion to suppress evidence seized at Mejias' and the 30th Street apartments.

The federal indictment in this case covered an earlier and longer period of time than that returned by the State, and identified many more individuals as co-conspirators. The government has represented that the federal investigation was based not only on state-compiled evidence, but also on evidence developed independently of the original joint investigation, and that evidence seized at the time of the state arrests in 1974 was not turned over to the federal government until a portion thereof was subpoenaed in September 1975 for use in the *Bravo* trial. When the federal grand jury investigation commenced at the end of January 1976, additional evidence was delivered to the federal authorities by the State.

■ The appellants argue that because of the agreement between federal and state authorities to cooperate in the investigation and prosecution of this conspiracy, and the resultant pooling of resources and manpower, evidenced by the presence of federal agents at each of the state arrests, the federal government should be charged with the September 3 and October 4, 1974 arrests for speedy trial purposes. For reasons of policy and precedent we disagree.

It is obviously in the public interest for federal and state law enforcement agencies to coordinate their efforts in situations of concurrent jurisdiction with each authority bound by budgetary limits on the scope of its respective activities. The alarming proportion of traffic in dangerous drugs has presented an increasingly serious threat to the public welfare, especially in the metropolitan New York area. Reduction and control of drug trafficking require a close and continuing cooperation among all governmental agencies with a concomitant pooling of strength and division of responsibility.[9]

As the local authorities frequently have far superior means for conducting local surveillance, and the federal authorities have more extensive means of investigation regarding movements in and out of the country and across state lines, there are obvious advantages in establishing the kind of partnership which was here employed. The mere existence of federal jurisdiction over particular offenses, however, does not preclude the state from initially exercising its prosecutorial power; and in narcotics conspiracy cases, where there are strong independent federal interests in preventing illegal entries of aliens and contraband into the United States, it is desirable that the federal government be kept apprised of state prosecutorial developments in order to assess the situation and take the necessary steps adequately to enforce the federal laws and protect the public.

It was, therefore, entirely proper for the federal government to defer to the state exercise of prosecutorial power over appellants without foregoing its right to proceed against them if at any time it became advisable to do so. When the success of the state prosecution was seriously jeopardized by the state court suppression ruling (a ruling we hold to have been erroneous), it became the clear duty of the federal authorities to proceed against the individuals involved, including these appellants.

■ Moreover, to hold as appellants urge would require our rejection of the doctrine of dual sovereignty, formulated by the Supreme Court in *United States v. Lanza*, 260 U.S. 377, 43 S.Ct. 141, 67 L.Ed. 314 (1922), and reaffirmed in *Abbate v. United States*, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959). This doctrine recognizes that the federal government is not bound by the actions of state authorities and that succes-

---

9. See The President's Commission on Law Enforcement and Administration of Justice, *Task Force Report: Narcotics and Drug Abuse* at 9 (1967).

sive state and federal prosecutions are constitutionally permissible. On the facts of this case, particularly where the federal government specifically agreed not to arrest appellants in the first instance, and the arrests were made by and under the auspices of state authorities with appellants arraigned on state charges, we see no reason to fault the government for the delay in the state proceedings.

Other considerations, peculiar to each violation alleged, bolster our conclusion that February 19, 1976, the date of the federal indictment and arrests, is the date which should trigger the commencement of the speedy trial periods in issue. Rule 5 of the Southern District Interim Plan, requiring the government to be ready for trial "within six months from the date of the arrest . . . or the filing . . . of a formal charge upon which the defendant is to be tried . . . , whichever is earliest," was enacted to preserve public confidence in the ability of federal courts promptly to dispose of federal criminal cases.

> The purpose of Rule 4 is to insure that regardless of whether a defendant has been prejudiced in a given case or his constitutional rights have been infringed, the trial of the charge against him will go forward promptly instead of being frustrated by creeping, paralytic procedural delays of the type that have spawned a backlog of thousands of cases, with the public losing confidence in the courts and gaining the impression that federal criminal laws cannot be enforced. *Hilbert v. Dooling*, 476 F.2d 355, 357–58 (2d Cir.) (en banc), cert. den., 414 U.S. 878, 94 S.Ct. 56, 38 L.Ed.2d 123 (1973); see *United States v. Furey*, 514 F.2d 1098, 1101 (2d Cir. 1975).

As a result of the initial arrests in September and October 1974, appellants were arraigned on state charges and placed in state custody. As Judge Carter aptly noted, to charge the federal government with

these state arrests would be to force immediate federal indictments and trials of state arrestees in joint jurisdiction cases, thereby crowding the federal court calendar in contravention of the purpose of the Rule. 417 F.Supp. at 591.

Different considerations relate to the claims under the Sixth Amendment, with which Rule 48(b), Fed.R.Crim.P., is coterminous. *United States v. Infanti*, 474 F.2d 522, 527 (2d Cir. 1973); *United States v. Singleton*, 460 F.2d 1148, 1152 (2d Cir. 1972), cert. den., 410 U.S. 984, 93 S.Ct. 1506, 36 L.Ed.2d 180 (1973). The Sixth Amendment inquiry requires a balancing of relevant factors, particularly the length and reason for the delay, prejudice to the defendant, and the defendant's assertion of his rights. *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Judge Carter thoroughly examined each of these elements and found defendants' arguments with respect to three of the four factors insubstantial.[10] 412 F.Supp. at 592–95. Appellants rely on *United States v. Cabral*, 475 F.2d 715 (1st Cir. 1973), and *Gravitt v. United States*, 523 F.2d 1211 (5th Cir. 1975), to support their contrary position. Both cases involved state arrests and arraignments followed by federal prosecutions stemming from substantially the same offenses. An analysis of those cases, however, reveals that the bases for the attachment of Sixth Amendment speedy trial rights were not the prior state arrests, but rather acts which occurred virtually contemporaneously with the arrests—the turnover to the federal government by the state of the evidence which supported the federal charges in *Cabral*, and the issuance of a federal arrest warrant in *Gravitt*. Such is not the case before us. The evidence in possession of the State was not turned over to the federal authorities for at least a year following the September 3, 1974 arrests, and no federal charges were lodged against appellants until February, 1976.

---

**10.** Judge Carter discounted appellants' assertion of their speedy trial rights as a factor to be weighed. Although this assertion was not made until after the federal indictment, Judge

Carter reasoned that no prior assertion could have been made unless appellants could have been expected to have anticipated the federal prosecution.

■ No Sixth Amendment violation would exist even if September 3 and October 4, 1974 marked the commencement of the speedy trial periods. Under all the circumstances the twenty and twenty-one month delays between the state arrests and the trial were not extraordinary. See *United States v. Lasker,* 481 F.2d 229 (2d Cir. 1973), cert. den., 415 U.S. 975, 94 S.Ct. 1560, 39 L.Ed.2d 871 (1974); *United States v. Infanti, supra.* The delay was engendered in order for the federal government to determine the need for, and scope of, charges to be brought, including, necessarily, an assessment of the state proceedings, to complete its investigation, and to obtain and compile evidence. Several witnesses, as well as the prosecutor most familiar with the case, were engaged in the intervening *Bravo* trial, which lasted from October 1975 to January 1976. Under all the circumstances, particularly the acquisition and assessment of complex evidence from the state, we cannot say that the delay was so unreasonable as to require the dismissal of the indictment.

Moreover, appellants have failed to show any particular prejudice resulting from the delay.

■ The claim of pre-indictment delay in violation of due process is equally meritless. Since the indictment was returned within the five-year period provided by the statute of limitations, the burden was on appellants to establish that the "pre-indictment delay . . . caused substantial prejudice to [appellants'] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." *United States v. Marion,* 404 U.S. 307, 325, 92 S.Ct. 455, 466, 30 L.Ed.2d 468 (1971); *United States v. Eucker,* 532 F.2d 249, 255 (2d Cir. 1976); *United States v. Frank,* 520 F.2d 1287, 1292 (2d Cir. 1975), cert. den., 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976).

Appellants contend that the federal deference to the state prosecutions was purposefully designed so as to give the government "two bites at the apple," as well as the opportunity to use the threat of state prosecution to force cooperation, to try appellants after it had the experience of the *Bravo* trial, and to buy more time to work on the trial in this case. For the purposes of this claim, the district court appears to have accepted the facts as stated in appellants' offers of proof as true, but found them legally insufficient in the face of proof offered by the government which indicated, *inter alia,* that the government did not even begin to formulate plans to prosecute appellants until after the result of the state suppression hearing. This finding has ample support in the record.

■ From September, 1975, the point at which the government decided to undertake the prosecution, to the date of the filing of the indictment, only five months elapsed, during which time the government was completing its investigation and collecting additional evidence. Under all the circumstances the government acted with due diligence. See *United States v. Ferrara,* 458 F.2d 868, 875 (2d Cir.), cert. den., 408 U.S. 931, 92 S.Ct. 2498, 33 L.Ed.2d 343 (1972); *United States v. DeMasi,* 445 F.2d 251, 255 (2d Cir.), cert. den., 404 U.S. 882, 92 S.Ct. 211, 30 L.Ed.2d 164 (1971); *United States v. Parrott,* 425 F.2d 972, 975 (2d Cir.), cert. den., 400 U.S. 824, 91 S.Ct. 47, 27 L.Ed.2d 53 (1970).

THE SEARCH AND SEIZURE CLAIMS

On September 3, 1974 Detective Manning, on surveillance of the apartment building at 445 West 48th Street in Manhattan, where Mejias lived, reported seeing Mario Navas and Mejias meet, enter the building and exit a short time later. Although Navas carried a red shopping bag into the building, he left empty-handed. Later the same day, Detective Palazzotto, after having received various investigative and surveillance reports, including that of Manning, assumed surveillance outside Mejias' apartment. Shortly thereafter, he was authorized by his superiors to arrest if he saw fit. At 4:45 p. m. Mejias, accompanied by a man and woman subsequently identified as Padilla and Valenzuela, arrived by taxicab, and entered the building carrying boxes. Palazzotto then decided to arrest Mejias,

and he and three other officers, two of whom were federal agents, entered the building. After checking the roof for a rear exit to Mejias' apartment, Palazzotto proceeded to the apartment and stood outside the door, while another officer rang the outside lobby bell to the apartment. Palazzotto heard the buzzer releasing the lobby door and footsteps approaching the apartment door. He knocked; Mejias opened the door to the width of the chain securing it. Palazzotto identified himself, showed Mejias his detective shield, and told him that he was under arrest. When Mejias retreated from the doorway out of view, Palazzotto, aided by another officer, pushed open the door by force. Upon entering, they saw Valenzuela, Padilla and Salazar, the latter two with money in their hands, rising from a sofa bed upon which were piles of cash, a red shopping bag, a brown bag, and pieces of cardboard bearing names and dollar figures. They then arrested the four occupants.

Approximately five hours later, Detective Ramos arrived with a search warrant issued by a Justice of the New York Supreme Court.[11] Thereupon a thorough search was conducted and evidence seized. Contending that the warrantless arrest of Mejias was illegal, Padilla, Mejias and Salazar moved prior to trial to suppress the evidence seized. Judge Carter denied the motion.

■ Appellants' assertion that the government is barred from using the evidence since it was suppressed by the New York Supreme Court[12] is erroneous. We have previously held that a prior adverse suppression decision in state court does not collaterally estop the United States, not a party to the state action, from using the evidence in a federal proceeding. *United States v. Magda*, 547 F.2d 756 (2d Cir.,

1976); *United States v. Panebianco*, 543 F.2d 447, 456 (2d Cir. 1976).

■ It was lawful for the state officers to force entry into Mejias' apartment to arrest him. The power of state officers to make an arrest for state offenses is determined by state law. *Miller v. United States*, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958). Section 120.80(5) of the New York Criminal Procedure Law allows an officer, otherwise authorized to arrest, to break into premises when refused entry, after first having given notice of his authority and purpose. Since it is uncontroverted that Palazzotto had probable cause to believe that Mejias was committing a crime, and that Mejias was present in the apartment, the warrantless arrest in this case was authorized. N.Y.C.P.L. §§ 140.10(1), 140.15. Thus, the motion to suppress was properly denied.

■ Rojas was arrested on West 30th Street in Manhattan, shortly after leaving the 30th Street stash apartment. He was charged with possession of cocaine seized at the 30th Street apartment, and the conspiracy charge against him similarly alleged, as one of his overt acts, possession of the cocaine seized. Rojas moved prior to trial to suppress; this motion was summarily denied without a hearing. He subsequently was convicted on both counts and sentenced to identical concurrent terms of imprisonment on both convictions.

Consequently, we need not reach the merits of Rojas' claim that the district court erred in denying his motion to suppress evidence seized at the 30th Street apartment. Notwithstanding our power to consider this claim, *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), where concurrent sentences have

11. No issue has been raised on appeal relating to probable cause for the issuance of the search warrant.

12. The state judge found that the entry into Mejias' apartment was not to arrest Mejias, but rather was a pretext to secure the apartment and its occupants until a search warrant could be obtained. He concluded that, in the absence

of exigent circumstances, the actions of the arresting officers constituted a Fourth Amendment violation. Judge Carter, however, disagreed with the findings and conclusions of the state court. A federal court is not bound by the state court ruling. See generally *Elkins v. United States*, 364 U.S. 206, 223–24, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

been imposed for convictions under several counts of an indictment, review may be declined if the conviction on one count was proper and no claim of resulting collateral consequences has been made. *Andresen v. Maryland*, 427 U.S. 463, 469 n. 4, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976); *United States v. Vasquez*, 468 F.2d 565 (2d Cir. 1972), cert. den., 410 U.S. 945, 93 S.Ct. 1400, 35 L.Ed.2d 612 (1973); *United States v. Gaines*, 460 F.2d 176 (2d Cir.), cert. den., 409 U.S. 883, 93 S.Ct. 172, 34 L.Ed.2d 139 (1972).

No issue has been raised as to the conviction on the conspiracy count; nor could Rojas succeed in challenging that conviction at this juncture. Although his suppression motion apparently focused on both the possession count and the overt act of possession of the conspiracy count, his reliance on the automatic standing doctrine of *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), to contest the seizure as to the conspiracy charge is misplaced. While a charge of possession may create automatic standing, a charge of conspiracy, even though it involves a possessory overt act, cannot. *Brown v. United States*, 411 U.S. 223, 229, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *United States v. Galante*, 547 F.2d 733 (2d Cir. 1976). Since Rojas has never demonstrated his standing, see *Brown v. United States, supra*, he is foreclosed from challenging the seizure on the conspiracy count. His conspiracy conviction, therefore, remains undisturbed regardless of how we might rule on the denial of the suppression motion. We accordingly choose to affirm Rojas' convictions, without considering his claim on the possession count, *United States v. Gaines, supra*, 460 F.2d at 178–80.

## SUFFICIENCY OF THE EVIDENCE AGAINST RAMIREZ

■ Ramirez's contention that the proof was insufficient to evidence his participation in the conspiracy must be rejected.

The direct and circumstantial evidence, viewed in the light most favorable to the government, established Ramirez's participation in the conspiracy by a fair prepon-

derance of the independent, nonhearsay evidence.

Ramirez concedes that Mono was a narcotics dealer who used money orders to forward narcotics proceeds to the organization in Colombia. Since there is no question that there was ample evidence of the conspiracy, the government merely had to show "a likelihood of illicit association" between Ramirez and the co-conspirators. *United States v. Calabro*, 449 F.2d 885, 891 (2d Cir. 1971), cert. den., 404 U.S. 1047, 92 S.Ct. 728, 30 L.Ed.2d 735 (1972); *United States v. Ragland*, 375 F.2d 471, 477 (2d Cir. 1967), cert. den., 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968).

The $10,000 in money orders found on Ramirez's person following his conversations with Mono indicated, *inter alia*, Ramirez's knowledge that this sum represented narcotics proceeds, that Mono preferred to be paid in money orders, and that Rojas was one of Mono's distributors; and Ramirez's possession of Rojas' telephone number supported the inference of a relationship between them, *United States v. Head*, 546 F.2d 6, 9 (2d Cir., 1976), *United States v. Panebianco, supra*, at 457. Moreover, on the basis of the conversations between Ramirez and Mono and the surveillance of Ramirez's meeting with Mono on the day of his arrest, the jury could infer Ramirez's knowing participation in the conspiracy. See *United States v. Tramunti*, 513 F.2d 1087, 1108–09 (2d Cir.), cert. den., 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *United States v. Stromberg*, 268 F.2d 256, 267–68 (2d Cir.), cert. den., 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959). The use of code and guarded language was additional evidence which the jury could consider in reaching this conclusion. *United States v. Sisca*, 503 F.2d 1337, 1343, (2d Cir.), cert. den., 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974).

The evidence against Ramirez, taken as a whole, was such that "a reasonable mind might fairly conclude that [he] was guilty beyond a reasonable doubt." *United States v. Wiley*, 519 F.2d 1348, 1349 (2d Cir. 1975), cert. den., *James v. United States*, 423 U.S.

1058, 96 S.Ct. 793, 46 L.Ed.2d 648 (1976). As such, it was proper to submit the case against Ramirez to the jury.

## ADMISSIBILITY OF EVIDENCE AGAINST PADILLA

■ Padilla argues that his conviction must be reversed because a hotel receipt, a luggage invoice and a travel agency business card seized from him after his federal arrest were hearsay and improperly received in evidence over his objection that no proper foundation for their admission as business records had been laid. The hotel receipt, from the Skyline Motor Inn, stated that $33.40 had been paid for Room 327 on September 2, 1974. The invoice, from the L & L Luggage Company to F. Padilla, was for "1 American Tourst [sic] Tote for Men," costing $28 less a $10 deposit. These documents were not offered to prove either the payment of a hotel bill or the purchase of a piece of luggage, but were circumstantial evidence of Padilla's connection with the Skyline Motor Inn and the attache case seized therefrom. The business card, of one Oscar Perez from the Las Americas Travel Agency, noted Padilla's name and a flight schedule for April 27, 1974 to Curacao and Colombia on the reverse side. The fact that Padilla possessed this card showed a relationship between Padilla and Perez, who testified that Padilla was in Colombia after April 27. Because these documents were not offered to prove the truth of their contents, they were not hearsay, Fed.R. Evid. 801(c); and the jury could consider them circumstantially to corroborate other evidence in the case. *United States v. Canieso*, 470 F.2d 1224, 1232 (2d Cir. 1972).

## PROSECUTORIAL MISCONDUCT

■ Although the appellants claim misconduct by the prosecutor in his attempts to read from exhibits, his extended comments when making objections, and his attempt to present arguments at sentencing, a review of the record satisfies us that none of the acts complained of, either individually or cumulatively, had the effect of depriving any of the appellants of a fair trial. Both defense counsel and the prosecutor were warned and reprimanded by Judge Carter on occasion; in the give and take of a lengthy trial it is inevitable that counsel will occasionally step over the line of propriety. Contrary instructions from the court are usually adequate to correct such situations and they were quite sufficient in this case.

■ We also reject the claim that the prosecutor caused prejudicial publicity by allowing himself to be interviewed by an NBC news team in connection with a telecast on the *Bravo* narcotics conspiracy which was broadcast during this trial. Prior to the broadcast Judge Carter properly cautioned the jury not to watch the program, and he afterwards commented to the jury on the innocuous nature of the program. The interview with the prosecutor was never shown; and there has been no showing of any possible prejudice. See *United States v. Pfingst*, 477 F.2d 177, 186 (2d Cir.), cert. den., 412 U.S. 941, 93 S.Ct. 2779, 37 L.Ed.2d 400 (1973).

## IMPROPER SENTENCING

■ Appellants argue that their sentences of 15 years' imprisonment should be vacated because Judge Carter abused his discretion by taking a fixed mechanical approach to sentencing in disregard of individual differences, by failing to consider relevant facts, particularly the sentences imposed on the *Bravo* defendants by Judge Cannella, and by weighing impermissible factors. Judge Carter said at the time of sentencing:

Let me make clear that the sentences I am going to give will probably be the most severe that I have ever given in my career, . . . but I am doing it because I think that people who come and deal in drugs and traffic and make profit on it from foreign countries coming into this country, that that is something that as a Judge, when I have the opportunity to, I cannot tolerate. . . .

We find no impropriety in the sentences imposed.

■ Sentences imposed within the statutory maximum are not reviewable in this Circuit, absent the possibility that the sentence was based on material misinformation or misunderstanding concerning a defendant, *United States v. Stein*, 544 F.2d 96 (2d Cir. 1976); *United States v. Robin*, 545 F.2d 775 (2d Cir. 1976), or on constitutionally impermissible factors, *United States v. Brown*, 479 F.2d 1170, 1172 (2d Cir. 1973). Such is not the case here.

Judge Carter did give careful consideration to the record of each appellant. He made express references to Estella Navas' family situation, to Padilla's legal alien status and monetary motive, and to Salazar's role in the organization as clarified by Salazar's counsel. Judge Carter complied with defense requests that most of the appellants be credited with the time they had spent in state custody, and used the substantive counts as a means of differentiating between the sentences. It was entirely proper for Judge Carter to weigh the fact that these appellants caused illegal entries into this country, on false passports or otherwise, for the illegal distribution of large amounts of narcotics.

Regarding the appellants' argument that Judge Carter should have considered the sentences imposed on the *Bravo* defendants, appellants had the opportunity to call to the court's attention the sentences imposed by Judge Cannella. Apparently, they chose not to do so.

Convictions affirmed.