**UNITED STATES of America,
Appellant,**

v.

**LAI MING TANU, Appellee.**

**No. 223, Docket 78–1255.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 14, 1978.
Decided Nov. 17, 1978.

Oakes, Circuit Judge, concurred and filed opinion.

---

Glenn B. Kritzer, Asst. U. S. Atty., Eastern District of New York, Brooklyn, N. Y. (David G. Trager, U. S. Atty., and Harvey M. Stone, Asst. U. S. Atty., Eastern District of New York, Brooklyn, N. Y., of counsel), for appellant.

Lawrence Hochheiser, New York City (Kenneth J. Aronson, New York City, of counsel), for appellee.

Before OAKES, GURFEIN and MESKILL, Circuit Judges.

GURFEIN, Circuit Judge:

This appeal raises questions concerning *delay* in bringing a defendant to trial in the federal court after dismissal of state charges arising out of the same transaction. There is no problem of double jeopardy, *United States v. Lanza*, 260 U.S. 377, 43 S.Ct. 141, 67 L.Ed. 314 (1922); *Abbate v. United States*, 359 U.S. 187, 79 S.Ct. 666, 3

L.Ed.2d 729 (1959), and there would be no doubt that the federal indictment was properly brought if the question of delay were not involved.

The District Court for the Eastern District of New York (Hon. Jack B. Weinstein, Judge) dismissed an indictment against Mrs. Lai Ming Tanu for drug offenses on July 11, 1978. The conspiracy to distribute heroin charged in the indictment allegedly occurred from May 29 to May 30, 1974—more than four years earlier, but within the period of the statute of limitations. The substantive counts charged that the defendant possessed the heroin with intent to distribute *on* May 30, 1974. The charges thus arose from a single transaction over a two-day period, and the first trial in the federal District Court began more than four years after the state arrest.

After two mistrials, the District Court dismissed the indictment "pursuant to the Sixth Amendment, the Eighth Amendment, the inherent power of th[e] court to control its own procedures under Article III of the Constitution and the policy of the United States as reflected in Rule 50(b), in the Speedy Trial Act, and in the various plans adopted pursuant to the authority of those provisions."[1] The court added that the dismissal was not "for failure of proof" nor "for reasons of double jeopardy"[2] and suggested that the Government should appeal "to determine whether [the court] has any residual powers in this area." The United States appeals, pursuant to 18 U.S.C. § 3731. It contends that the District Court erred in dismissing the indictment. To understand the questions of law raised by the Government, it is necessary to review in some detail the proceedings, both state and federal, that led to the order of dismissal.

The defendant Lai Ming Tanu was arrested by New York City Police (accompa-

1. The District Judge briefly mentioned the Eighth Amendment's prohibition against cruel and unusual punishment as a possible basis for dismissal. In *United States v. Persico*, 425 F.2d 1375, 1384–85 (2d Cir.), *cert. denied*, 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108 (1970), we rejected the contention that four trials constituted cruel and unusual punishment.

2. The District Judge could not have dismissed the indictment after two hung juries on double jeopardy grounds, under our decision in *United States v. Castellanos*, 478 F.2d 749 (2d Cir. 1973).

nied by federal agents) on May 30, 1974, for allegedly participating in the sale of heroin to undercover police officers with two others, Yeo Chin Nee and Lee Swee Lye. The undercover police officers were part of a joint federal-state Task Force; federal agents of the Drug Enforcement Administration (DEA) participated with New York City Police in the arrests. United States Government money was used to purchase the heroin, and the heroin was taken into custody by the DEA, not the City Police.

The federal government, at that point, had all the evidence it needed for a successful prosecution. The joint task force decided, however, to prosecute the three defendants in the state court, which imposes heavier statutory sentences.[3] Accordingly, on the next day, May 31, 1974, Mrs. Tanu and the others were arraigned on state charges in the New York County Criminal Court. On June 21, 1974, they were indicted by a New York County Grand Jury on three felony counts: criminal sale of a controlled substance (about two pounds of heroin) in the first degree and criminal possession of a controlled substance in the first and third degrees. Lee Swee Lye and Yeo Chin Nee, who actually made the sale, entered pleas of guilty on February 3, 1976, in the Supreme Court, New York County, and were sentenced to imprisonment in March 1976.

After Mrs. Tanu appeared on sixty-four occasions in the state Supreme Court, where she continually requested a speedy trial, that court, in September 1976, dismissed the by-then 27 month old indictment against Mrs. Tanu (with prejudice), on the ground that the defendant had been denied her right to a speedy trial under the Sixth Amendment and under New York Criminal Procedure Law § 30.20 (McKinney 1971 & 1978 Supp). The state Special Narcotic Prosecutor elected not to appeal.

The DEA agent who was acting as liaison on the case, John Gartland, knew of the state's decision not to press the matter further but took no action at the time. Nothing was done by the United States to charge Mrs. Tanu from September 1976 to May 15, 1978 when the instant federal indictment was filed—about twenty months later.

The renewed federal interest in Tanu came about through an accident. The Government's brief recites the following chronology of events. In February 1977, Special Agent Robert Allen of the DEA—who was not a Task Force member—received an inquiry from Singapore concerning the status of the arrest involving Lee Swee Lye. Allen did not attend to the matter until April 1977. When he finally received the Lee Swee Lye file, he noticed that Mrs. Tanu had not been convicted in the state prosecution. Shortly thereafter, Margaret and Ernest Rossi, who had been arrested for the sale of heroin, told DEA agents that their source of supply was one "Anna Chu"—which was believed to be another name for Lai Ming Tanu. The United States Attorney's Office negotiated with the Rossis in an effort to get them to testify against Tanu, but their efforts failed, and in October 1977, the Rossis elected to stand trial. Agent Allen then referred the matter of Tanu to the United States Attorney's Office, which opened a file on her in November 1977. On December 20, 1977, the United States Attorney requested approval to prosecute from the Department of Justice, apparently because the Department guidelines require permission from the Attorney General for a federal prosecution after a state prosecution for the same offense. See Petite v. United States, 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960). The United States Attorney received approval to prosecute in early February 1978.[4]

---

3. If convicted of first degree criminal sale and possession of narcotics, N.Y. Penal Law §§ 220.43, 220.21 (McKinney 1978 Supp.), defendants faced a mandatory maximum sentence of life imprisonment with a mandatory minimum of at least 15 years of imprisonment, under state law. N.Y. Penal Law § 70.00(2)(a) & (3)(a)(i) (McKinney 1975).

4. The record does not indicate what the United States Attorney's office told the Attorney General's office about the facts, or why the Attorney General decided to allow further prosecution.

Three months later, on May 15, 1978, Mrs. Tanu was indicted by the federal grand jury for the same transaction that was the subject of the state indictment. The federal indictment also included a charge of possession of heroin found at the Pan American Motor Inn (see below), on which the county grand jury had refused to indict, together with a charge of conspiracy covering possession on May 30, 1974, the same date as alleged in the state indictment. By now, the act of possession which constituted the gravamen of both the state and federal charges (as is not uncommon in narcotics cases) had occurred four years earlier, and the state prosecution had already been dismissed twenty months before on Sixth Amendment grounds.

Judge Weinstein held initially that there was neither a Sixth Amendment nor a speedy trial ground for dismissing the federal indictment, despite the surface anomaly that the state court had already dismissed its indictment on speedy trial grounds. He accordingly ordered the case to trial, denying the Government's motion to postpone the trial because of the defendant's obviously pregnant condition, which the prosecution feared might elicit sympathy from the jury.

The first trial began on June 30, 1978. The Government's case indicated that at 7:00 P.M. on May 30, 1974, two police officers, acting in an undercover capacity, paid $52,000 in pre-marked official Government funds to Yeo Chin Nee and Lee Swee Lye in Room 26 of the Queens Motel. The defendant Tanu was sitting at the time in a telephone booth located in the lobby near Room 26. She was holding the receiver to her ear but did not appear to be talking. Lee Swee Lye left Room 26 carrying the money paid by the police officers, whereupon Tanu hung up the phone, left the booth, and accompanied Lee Swee Lye upstairs to Room 55. While waiting for Lee Swee Lye and Tanu to emerge, Detective Wright and Agent Gartland heard talking in Chinese and the sound of money being counted. When the door was opened, Tanu and Lee Swee Lye were arrested. In Mrs. Tanu's handbag, the officers found $37,000 of the pre-marked money, a key and a payment receipt in the name of "Tanu" for Room 504, Pan American Motor Inn, Queens (which was less than a mile from the Queens Motel), and keys to Tanu's safe deposit box at the China Safe Deposit Box Company. Pursuant to a search warrant obtained from a state judge, Room 504 of the Pan American Motor Inn was searched early the next morning. A cosmetic case found in that room contained 652 grams of heroin wrapped in a Chinese language newspaper. On June 19, 1974, a consent search of the safe deposit box turned up $10,600 in cash.

Lee Swee Lye, though attempts were made by the Government to sway him to the contrary, testified for the defense. He swore that Tanu was his "girlfriend" on May 30, 1974 and that she had no knowledge of the sale of heroin to the police; that he had asked her to join him at the Queens Motel only for companionship; and that he had asked her to carry the money found in her pocketbook, telling her he had won it on a horse race. He also swore that the heroin found in Room 504 of the Pan American Motor Inn was his, and that Tanu did not know that the package contained heroin.

With the issue of guilt or innocence thus clearly posed, the prosecution, in rebuttal, called Margaret Rossi (who by now had been convicted in her own case). She testified that when she was a heroin addict between 1970 and 1972 she purchased heroin more than twenty times from the defendant, whom she knew as "Anna Chu." To counter this damaging testimony, the defendant called her husband, Jack Tanu, who testified that he met the defendant in Hong Kong in 1969 and married her there in 1972; that the defendant then lived with her father in Hong Kong; and that the father died in October 1975. Mr. Tanu further testified that the defendant had never been in the United States before May 1973, and her immigration papers and passport showed that she apparently first entered the United States on that date.

The first trial resulted in a mistrial, based upon the jury's inability to agree on a verdict, on July 5, 1978. The court refused to dismiss the indictment and the second trial began the next day, July 6, 1978. This time the defendant did not offer any evidence. Again the jury was unable to reach a verdict, and on the defendant's motion a second mistrial was declared. The judge then dismissed the indictment for the reasons noted above.

Opposing the dismissal, the Government moved for an adjournment until after the defendant had given birth to her baby, and represented that if there should be a jury deadlock on the third trial there would be no further prosecution. The court noted that the defendant was not due to have her child until November, that at least another four months would go by before any possible retrial, and that it "is cruel to place a pregnant woman under that burden facing another trial. . . . I really think that

some sensibilities and some humanity is not beyond the realm of consideration." The judge dismissed the indictment.

### I

In *United States v. Weinstein*, 452 F.2d 704 (2d Cir. 1971), *cert. denied*, 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972), we held that while a district court may grant a new trial after conviction, pursuant to Fed.R. Crim.P. 33, "in the interest of justice," it does not have power to *dismiss* an indictment that is legally sufficient under the test of Rule 29, simply because it deems the dismissal to be in the interests of justice.[5] In a scholarly opinion, Judge Friendly noted the absence of any such affirmative authority to dismiss either in the Federal Rules or at common law here or in England.[6]

■ Under the separation of powers, the executive branch, rather than the judiciary, retains the power to dismiss prosecutions on

---

**5.** That conclusion also comports with several decisions of the Supreme Court and our sister circuits. In *Ex Parte United States*, 287 U.S. 241, 53 S.Ct. 129, 77 L.Ed. 283 (1932), a unanimous Court denied a federal judge the discretionary power to decline to issue a bench warrant upon a grand jury indictment, declaring that the judge lacked "discretion permanently to refuse to enforce" the prosecution. *Id.* at 250, 53 S.Ct. at 132. The Court has similarly disposed of a judicial claim of discretionary control over grand jury decisions to indict, *United States v. Thompson*, 251 U.S. 407, 414–15, 40 S.Ct. 289, 64 L.Ed. 333 (1920), and of a discretionary judicial decision to suspend a sentence for the conviction of a crime with a statutory minimum penalty, *Ex Parte United States*, 242 U.S. 27, 41–42, 37 S.Ct. 72, 61 L.Ed. 129 (1916). As the Court noted in the last of these cases, considering the general question of judicial discretion and law enforcement, "the possession by the judicial department of power to permanently refuse to enforce a law would result in the destruction of the conceded powers of the other departments. . . ." *Id.* at 42, 37 S.Ct. at 74. *See United States v. Gainey*, 142 U.S.App.D.C. 262, 440 F.2d 290 (1971) (overturning discretionary dismissal of charges by district judge who balanced need for further punishment and impact on docket of further proceedings); *In re Petition of United States*, 306 F.2d 737 (9th Cir. 1962) (*per curiam*) (no trial court discretion to dismiss several counts of indictment because judge felt punishment on one count would be enough).

**6.** In *United States v. Dooling*, 406 F.2d 192, 196–97 (2d Cir.), *cert. denied*, 395 U.S. 911, 89 S.Ct. 1744, 23 L.Ed.2d 224 (1969), we mentioned in passing, but expressly declined to discuss, several cases which might be read in support of an inherent power of a district court to do justice. None of these cases actually provides any firm support for the proposition that such an inherent power exists. In *United States v. Apex Distributing Co.*, 270 F.2d 747 (1959) (*en banc*) and *United States v. Heath*, 260 F.2d 623 (1958), the Ninth Circuit never reached the merits of the District Court's power to dismiss an indictment in the interests of justice because the cases were dismissed on jurisdictional grounds. Yet in each case, the Court noted, dismissals were predicated upon an inability or unwillingness of the Government to come forward with evidence required to be turned over to the defense; hence, the dismissals were alternatively conceptualized as Rule 48(b) dismissals for want of prosecution. 270 F.2d at 755–56; 260 F.2d at 632.

*O'Neal v. United States*, 272 F.2d 412 (5th Cir. 1959) (*per curiam*), did not concern a District Court dismissal, but merely the power of an appeals court to vacate a prior dismissal of appeal that had been the result of a technical misunderstanding. And in *United States v. Kane*, 243 F.Supp. 746, 752–54 (S.D.N.Y.1965), Judge Weinfeld *rejected* an invitation to dismiss an indictment on general grounds of abuse of process; indeed his analysis was in terms of legal grounds for dismissal.

other than strict grounds of insufficiency in law. In his last opinion, the late Judge Murrah wrote: "The Executive remains the absolute judge of whether a prosecution should be initiated and the first and presumptively the best judge of whether a pending prosecution should be terminated." *United States v. Cowan*, 524 F.2d 504, 513 (5th Cir. 1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2168, 48 L.Ed.2d 795 (1976).

The emphasis in recent years on the speedy trial provision of the Sixth Amendment, *see Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), on the concomitant Rule 48(b), on the interim Speedy Trial Plans and, now, on the Speedy Trial Act, has added a new dimension. Regardless of the defendant's guilt or innocence, courts are permitted to exercise the power of dismissal against the wishes of the prosecutor when there is a failure to prosecute that is unjustified either because of the literal application of the statute or because of a showing of prejudice to the accused or an intentional delay by the prosecution to effect such prejudice.

The District Court, accordingly, treated this case properly as going beyond *United States v. Weinstein, supra*, in that it implicated considerations of the denial of speedy trial, with which our decision in that case was not concerned. We turn to those considerations.

## II

The first question is whether appellee, a defendant in the federal court, can be considered as "accused" *before* she has been subjected to a *federal* arrest, or whether she is merely in a pre-prosecution period even though she was subjected to the *state* arrest with the acquiescence of the federal government.

In *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), the Court held that a *pre-prosecution* delay is not a constitutional ground for dismissing an indictment under the Sixth Amendment. The Court noted, however, "that the Due Process Clause of the Fifth Amendment [as distinct from the Sixth Amendment Speedy

Trial Clause] would require dismissal of the indictment if it were shown at trial that the *pre-indictment* delay in this case caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." *Id.* at 324, 92 S.Ct. at 465 (emphasis added; footnote omitted).

This application of a Due Process claim was diluted somewhat in *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). After stating "that the Due Process Clause has a limited role to play in protecting against oppressive delay," *id.* at 789, 97 S.Ct. at 2048, the Court announced that proof of prejudice was necessary, and that even when such actual prejudice is shown, the inquiry must also consider the reasons for the delay as well as the prejudice to the accused. *Id.* at 790, 97 S.Ct. 2044.

Putting aside for the moment the alternative "Due Process" ground, these cases make it clear that pre-indictment delay is not, as a general matter, a violation of the Sixth Amendment.

Neither *Marion* nor *Lovasco*, however, concerned the situation where a defendant had been arrested for a state crime and was later indicted for substantially the same offense by a federal grand jury. The Supreme Court has not yet ruled on whether, for Sixth Amendment purposes, the defendant in such circumstances could ever be treated as an "accused" during the period before his *federal* arrest or indictment.

We have been confronted with such a situation in this Circuit, however. *United States v. Mejias*, 552 F.2d 435 (2d Cir.), *cert. denied*, 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 115 (1977). We were faced with three claims in *Mejias* under: (1) the Southern District Interim Plan pursuant to the Speedy Trial Act of 1974; (2) the Sixth Amendment and Rule 48(b) (Fed.R.Crim.P.) coterminous therewith, *id.* at 442; and (3) the Due Process Clause of the Fifth Amendment, *id.* at 443.

Our decision in *Mejias* disposed of each of the three claims on separate grounds, as we

shall see. In *Mejias*, the relevant facts were close to the facts at bar. There, too, there was a joint federal-state investigation of illegal narcotics activity. There, too, the arrest and indictment were by the state with the agreement of the federal government. And there, as here, defendants asserted that their federal statutory and constitutional speedy trial rights attached on the dates of their respective arrests by the New York authorities.

We disagreed with respect to the Interim Speedy Trial Plan "[f]or reasons of policy and precedent." 552 F.2d at 441. Judge Lumbard noted that such a holding would tend "to force immediate federal indictments and trials of state arrestees in joint jurisdiction cases" thereby further crowding the federal court calendar in contravention of the purpose of the local district plan. *Id.* at 442. We, therefore, rejected the date of the *state* arrest as being the "arrest" meant in the Interim Plan for Speedy Trials.[7]

We recognize that despite the similarities between the two cases, the facts here do differ from those in *Mejias* in important respects. Here the contraband evidence was taken by the federal government at the time of arrest. In the *Mejias* case, the federal government could not proceed until it obtained the contraband evidence from the state, an event which did not occur until one year after the state arrests, and only five months before the federal indictment. 552 F.2d at 440–41. In *Mejias*, the Government actually conducted a fresh investigation, procured new evidence and added some conspirators. The resulting federal indictment was thus broader in scope than the state indictment. Here, on the other hand, the basis for the federal indictment was possession of narcotics on the same day as charged in the state indictment, by the single remaining unconvicted defendant in the state proceeding. The prosecution in practical effect, though not technically, was the same prosecution: Finally, in *Mejias*, the federal government picked up rather

promptly after the state had simply lost a round in the suppression hearing. *Id.* at 440–41. In this case, federal authorities did not decide to prosecute for a year and a half after there was an actual dismissal of the state indictment for failure to afford appellee her Sixth Amendment (through the Fourteenth Amendment) right to a speedy trial. Despite these factual distinctions, however, we are bound to say that in the light of *Mejias* a defendant does not become an "accused" for Speedy Trial Act purposes until he is under *federal* arrest. *Mejias* is a binding precedent, and we independently agree with its holding so far as the Speedy Trial Act claim is concerned.

Turning to the Sixth Amendment claim in *Mejias, supra,* we accepted as our premise the balancing considerations of *Barker v. Wingo, supra,* particularly, (i) the length of the delay, (ii) the reason for the delay, (iii) prejudice to the defendant, and (iv) the defendant's assertion of his rights. After disposing of the claim based on the Interim Plan, we recognized, with regard to the constitutional claim under the Sixth Amendment, that there were "[d]ifferent considerations." 552 F.2d at 442. Applying the balancing test of *Barker v. Wingo, supra,* we found it unnecessary to decide, however, whether the dates of the state arrests were crucial for Sixth Amendment purposes, for we held that even if those dates were taken to be the starting dates, there was still no constitutional speedy trial violation on the facts. *Id.* at 442–43.

The question remains open, therefore, whether there are circumstances under which the Sixth Amendment speedy trial provision, as interpreted in *Barker v. Wingo,* may be applied continuously to successive state and federal prosecutions for the same transaction. *See United States v. Cabral,* 475 F.2d 715 (1st Cir. 1973).

One of the troublesome aspects of our federal system is its duality and the occasional overlapping of state and federal prosecutions. It is settled, of course, that successive state and federal prosecutions do

---

7. The identical timing principle applies to the scope of the speedy trial right under the Act as applies to the Interim Plans. *See United States v. Hillegas,* 578 F.2d 453, 456–57 (2d Cir. 1978).

not amount to double jeopardy. *United States v. Lanza, supra; Abbate v. United States, supra.* But some sensitivity exists lest separate prosecutorial powers be asserted to the prejudice of the accused. *See United States v. Cabral, supra.* For instance, the Supreme Court rejects the "silver platter" doctrine which formerly held admissible in *federal* prosecutions evidence that had been seized in violation of Fourth Amendment standards by state police. *See Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). In the self-incrimination context as well, the Court has departed from rigid adherence to the dual sovereignty conception of *King of the Two Sicilies v. Willcox,* 61 Eng.Rep. 116 (1851). *See Murphy v. Waterfront Commission,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). We recognize that the dual nature of our judicial system can sometimes lead to injustice. In fact, the Supreme Court is quick to acquiesce in decisions by the Department of Justice to undo federal prosecutions when state prosecutions for substantially the same offense have preceded. *Petite v. United States, supra; see Rinaldi v. United States,* 434 U.S. 22, 98 S.Ct. 81, 54 L.Ed.2d 207 (1977) (and cases cited *id.* at 25 n.8, 98 S.Ct. 81).

Since the question is not foreclosed, we leave open whether the Sixth Amendment speedy trial provision may ever be invoked when a federal defendant who has already been prosecuted in the state court shows prejudice. We do not reach that question on this appeal, however, because the District Court found that, in fact, there was no such prejudice. We agree with that finding.

Applying the tests of *Barker v. Wingo, supra,* we note that the only arguably improper delay attributable to the federal government is the period of twenty months between the dismissal of the state indictment and the filing of the federal indictment. During those twenty months, there was no trial prejudice from the loss of evidence. *See infra* p. 89. Nor was the appellee subject to any of the restrictions, *dehors* the trial itself, which sometimes can give rise to prejudice. During those twenty months appellee was not in prison, nor was she under the restrictions of bail. The finality that appeared to accompany the state dismissal made those twenty months a period of ostensible relaxation from peril. There was no burden cast upon her simply because she was a person formerly accused and now discharged. *Cf. United States v. Hillegas, supra* (considering statutory speedy trial right only).

### III

Nor, if we turn to the Due Process Clause of the Fifth Amendment, can we conscientiously find that there was substantial prejudice to Mrs. Tanu's right to a fair trial, or that the delay by the federal government was an "intentional device to gain tactical advantage over the accused." *Marion, supra,* 404 U.S., at 324, 92 S.Ct. at 465. We are not at liberty to broaden these grounds, considering the "limited role" of the due process clause in this area. *Lovasco, supra* 431 U.S. at 789, 97 S.Ct. at 2048.

The only possible prejudice at trial to appellee Tanu would have resulted during this period either from the death of her father, or from the intentional act of the prosecution in waiting for the Rossis to become witnesses. The District Judge, as we have seen, made no finding of prejudice for good reason. The father died in October 1975, and the state prosecution was pending until the dismissal in September 1976. *Before* that dismissal, the federal abstention was clearly proper. *See Mejias, supra,* at 443. Any delay by the federal government *after* the death of the father could not have prejudiced the appellee. Nor was there any proof that the post-dismissal delay was *intentional* on the part of the Government. There was, it is true, an extraordinary lack of liaison between state and federal prosecutors, which should be corrected, but there was nothing sinister about the breakdown in communications.

It may be suggested, of course, that waiting for the Rossis to cooperate was an unjustified delay. But the Rossis told the federal agents about appellee *before* her

federal indictment. In *Lovasco, supra,* Mr. Justice Marshall laid down a general rule that the Government, before indictment, can wait to get more evidence in order to preclude unwarranted prosecutions and to make more certain a verdict of guilty. The trial court could not have found, without abusing its discretion, that the delay was an "intentional device to gain tactical advantage over the accused." *Marion, supra,* 404 U.S. at 324, 92 S.Ct. at 465.

## IV

■ We can, therefore, find no escape from the conclusion that the District Court had no basis for dismissing the indictment on due process grounds, any more than on Sixth Amendment grounds, since prejudice, in the sense of a loss of evidence, was not shown.

Without evaluating guilt, there is, to be sure, room for the compassionate impulse in these circumstances. For here we find a concatenation of events that borders on the bizarre. Mrs. Tanu's ordeal in being unable to get a speedy trial in the state court, the inertia of the federal government, the two mistrials, her pregnancy and progressive physical deterioration in the presence of the trial judge, all these call for some sympathetic consideration. We think, however, that the power to give effect to such considerations lies with the Department of Justice, and not with the trial court. ˑ

We acknowledge with respect the sensibilities of the learned District Judge. In our system of imperfect justice there is, at times, a temptation to do what we think is more perfect justice. In an ordered system of criminal law we cannot, however, without statutory or rule-making authority, turn over to the judge the prerogatives and duties of the prosecutor. Judge Weinstein was aware that his power to dismiss was in doubt and he conscientiously urged the Government to appeal. ·

Appellee may be viewed, indeed, as a unique object of sympathy or simply as another person accused of a serious crime. The United States Attorney says that the Government will drop the prosecution if there is a third mistrial. Perhaps the Department of Justice will reconsider and decide to drop the prosecution after these two mistrials and such long delay, taking into consideration the necessary further delay attendant upon the birth of the child. We simply hold that this decision is in the hands of the prosecutor, not of the trial judge.

The order for dismissal is reversed and the indictment is reinstated.

OAKES, Circuit Judge (concurring):

I reluctantly concur.

I agree with the majority that the due process claim concerning federal preindictment delay is unavailing because the delay was prompted by federal deference to a state prosecution and was not "an intentional device to gain tactical advantage over the accused." *United States v. Marion,* 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971).

I also agree that the court does not have the inherent power to dismiss an indictment in the interest of justice.

Although the issue is close, I believe that there was sufficient delay to trigger a possible Sixth Amendment violation because the federal prosecuting authorities should have remained informed of the progress of the state prosecution. If the defendant had shown sufficient prejudice, the pretrial delay might have been excessive and might have warranted dismissal in light of the Government's inadequate explanation for the delay in instituting prosecution. The permissive dismissal provision of Fed.R. Crim.P. 48(b) also might have justified the court's action. I conclude, however, that the prejudice was insufficient to warrant dismissal.

Defendant was arrested on May 30, 1974, for her participation in a heroin sale that day by two others to undercover police officers. The operation was the work of a joint federal-state drug enforcement task force; the undercover officers were assigned to the task force, and federal officers participated in the arrest. Defendant was arraigned on state charges on May 31, 1974,

and indicted by a state grand jury for drug offenses on June 21, 1974. On September 7, 1976, the state court dismissed the indictment on speedy trial grounds because of repeated adjournments. Twenty months later, on May 15, 1978, defendant was indicted by a federal grand jury for drug offenses allegedly committed on May 29 and 30, 1974. The first trial, which commenced June 30, 1978, ended in a mistrial on July 5, 1978, when the jury could not reach a verdict. Retrial began the next day, and ended in a second mistrial on July 11, 1978. The court dismissed the indictment on that date.

I agree that under *United States v. Mejias*, 552 F.2d 435 (2d Cir.), *cert. denied,* 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 115 (1977), delay for Sixth Amendment purposes should not be measured by the May 1974 arrest, even though here the federal agents had the evidence and in *Mejias* they did not. But I think delay should be measured from the September 1976 dismissal of state charges. I nevertheless conclude, after balancing all the speedy trial right factors, that the court's dismissal was not within its discretion.

Under *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the court must consider four factors: the length of the delay, the reason for the delay, the defendant's assertion of his right to a speedy trial, and prejudice to the defendant. With respect to length of delay, as stated, I would measure the time from the dismissal of the state charges. Once a state arrest or indictment has occurred, the reasons expressed in *United States v. Marion, supra,* for not counting any earlier period for Sixth Amendment purposes no longer have force with respect to the federal charge. Because the stage charges have already disrupted the defendant's life, subjected her to "public obloquy," and caused her anxiety, *id.,* 404 U.S. at 320, 92 S.Ct. 455, there is no reason to apply the *Marion* requirement to the federal prosecution and measure the Sixth Amendment period by the timing of the *federal* arrest or indictment. Moreover, once the state charges were dismissed, particularly on speedy trial

grounds, the defendant might properly have assumed that prosecution was no longer likely, or even possible, and have governed her life accordingly; in this regard it is probably not without significance that she did subsequently become pregnant. On balance, it is my view that the period for calculating length of delay should begin at the point when the federal prosecutor should reasonably have initiated his own efforts.

Here, federal proceedings should reasonably have been initiated soon after the state indictment was dismissed—say two months. In light of the cooperative nature of the drug enforcement operation, federal officials should have remained abreast of state developments. Thus, the length of delay is at least twenty months (the twenty-two month period between the state dismissal and the second federal mistrial less a reasonable preindictment period of two months). The Government relies on *United States v. Hillegas*, 578 F.2d 453 (2d Cir. 1978), to support its view that the post-dismissal, pre-federal indictment period should be excluded. But *Hillegas* involved a federal charge dismissed by the Government because its principal witnesses refused to cooperate, followed by another federal charge after they had to do so. Here, the second (federal) indictment could have been brought immediately after the arrest but was deferred simply because of the state charge. Once the state charge was dismissed, there was no reason for the federal prosecutor not to proceed. In *Hillegas* the evidence was not yet available.

The second factor under *Barker* is the reason for the delay. The Government offers an explanation that is only partly convincing. Neglect seems to have caused some of the early delay, and the negotiations with the Rossis for evidence were quite prolonged. In a joint operation such as this, the Government might be expected to show somewhat more diligence; indeed, because the state dismissal was on speedy trial grounds, the federal prosecutor should have been especially careful to protect against future delay.

With respect to the third *Barker* factor, the Government concedes that defendant timely asserted her speedy trial rights. The fourth *Barker* factor, however—prejudice to the defendant—is more difficult to pinpoint. Defendant points to some prejudice: her anxiety at trial, especially because of her pregnancy, which she suggests might not have occurred had she known she was going to be charged with federal crimes, and the impairment of her defense caused by the weakened memory of her witness, Lee Swee Lye. The trial judge also relied on the asserted prejudice of her 1974 incarceration and the 1975 death of her father; but in light of my conclusion that only post-1976 delay is cognizable under the Sixth Amendment, I do not consider these events in the determination of the prejudice to defendant.

Balancing these factors, I find it a very close case whether the trial court's dismissal was proper. Certainly it would not have been error *not* to dismiss, but we must accord a substantial amount of deference to the court's decision, especially since the *Barker* test involves a "vague" right and requires an ad hoc balance, 407 U.S. at 521, 530, 92 S.Ct. 2182. I *am* troubled, however, because the court's final dismissal is not supported by careful findings of prejudice and is apparently inconsistent with the judge's earlier finding that the delay did not cause prejudice.[1] Crediting this earlier finding, I conclude that the dismissal is unwarranted; the marginal additional prejudice and delay from the second mistrial seem insufficient to tip the *Barker* balance in defendant's favor.

---

1. On July 3, 1978, after the jury in the first trial retired to consider its verdict, the court made the following finding:

   I find for the record that everything—I heard all of the evidence. I don't believe that the delay in prosecution inconvenienced the defendant or led to the loss of any evidence or made it more difficult for the defendant to try the case. I believe that the case was fairly tried.