**UNITED STATES of America, Appellant,**

v.

**Sam T. IAQUINTA, Velma E. Shine, Appellees.**

**UNITED STATES of America, Appellant,**

v.

**Sam Thomas IAQUINTA, Jr., Appellee.**

**Nos. 81–5167, 81–5168.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 8, 1982.

Decided July 1, 1982.

Before RUSSELL, HALL and MURNA-GHAN, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

The defendants Sam T. Iaquinta and Velma E. Shine indicted jointly for federal narcotics violations[1] and the defendant Sam T. Iaquinta indicted for firearms violations,[2] moved to dismiss the indictments under the Speedy Trial Act.[3] The district court, 515 F.Supp. 708, after a hearing, granted the motions to dismiss. The Government has appealed. We reverse.

The prosecution of the defendants arose out of a coordinated state and federal investigation. The investigation was triggered by information supplied by an informer to two federal agents. The informer had been introduced to the federal agents by a member of the West Virginia Department of Public Safety. As a result of the information furnished by the informer, state and federal officers began an investigation the first part of August, 1980, focusing on the narcotics activities of the defendants. However, before the state officers agreed to the investigation, Officer Lucas, who appears to have been the senior state officer involved, sought approval of state participation from the state prosecuting attorney. The state prosecuting attorney was reluctant to give approval in the absence of an understanding that the investigation was to be treated, and any prosecution which resulted from it handled, as a "state case." When officer Lucas assured the state prosecuting attorney that it was understood that "it was going to be a state case,"[4] the state prosecuting attorney gave his authorization for state participation. From this point the investigation proceeded as a cooperative effort in which five state officers and two or three federal officers were involved.

An informer allegedly purchased narcotics from the defendant Shine on August 4,

Betsy Steinfeld, Wheeling, W. Va. (Stephen G. Jory, U. S. Atty., Wheeling, W. Va., on brief), for appellant.

Franklin D. Cleckley, Morgantown, W. Va. (James A. Esposito, Fairmont, W. Va., on brief), for appellees.

1. 21 U.S.C. §§ 841(a)(1), 843(b), and 18 U.S.C. § 2.

2. 18 U.S.C.App. § 1202.

3. 18 U.S.C. § 3161(b).

4. Officer Lucas testified this was understood with the federal officers. The defendants question this evidence. However, the conduct of the parties is plainly consistent with this understanding.

1980, and a few days later the officers developed a plan for the purchase, through an informer accompanied by a state undercover officer, of narcotics from the defendants. Under the plan, the defendants were to be arrested by the state undercover officer at the time of the purchase. The state undercover officer who was to make the purchase was officer Plantz. Before proceeding with the plan, however, officer Lucas again sought authorization from the state prosecuting attorney for implementing the plan. After receiving that authorization the officers proceeded. An arrangement was made between the informer and the defendant Iaquinta for a meeting on the early afternoon of August 7, 1980, with officer Plantz at an apartment in Fairmont, West Virginia. The meeting was had as arranged; the purchase was attempted; and officer Plantz sought to arrest the defendant Iaquinta at the time. The defendant Iaquinta resisted. He and Plantz began to scuffle. During the scuffle both fell to the floor. At this point officer Lucas, who, with other state and federal officers, was maintaining surveillance of the house, rushed into the room where the defendant Iaquinta and Plantz were scuffling and Lucas arrested the defendant Iaquinta and the defendant Shine. When searched the defendant Iaquinta was found to be armed.

After the arrests the defendants were retained at the house for about two hours until the officers, armed with a search warrant issued by a state magistrate on the basis of an affidavit by a state officer, searched the defendants' residence, which was but a few doors from the dwelling where the defendants had been arrested. As a result of the search conducted under the supervision of officer Lucas, narcotics were seized by the state officers, who dispatched the seized contraband to the state laboratory for analysis. The seized contraband has since been retained in the custody and control of the state authorities and was in such custody at the time of the hearing in the district court on this motion. At the time of the search six firearms were also discovered and taken by the federal officers.

Following the completion of the search, the defendants were taken by a single state trooper in a state car to the state police barracks where the defendants remained for a short time. State and federal officers made some inquiries of the defendants during this time. The only inquiries directed at the defendants by the federal officers sought the identity of the defendants' source of supply in Florida. After an hour or so, the defendants were taken from the state police barracks to the chambers of a state magistrate, where they were served with state arrest warrants issued on the affidavit of a state officer which warrants charged the defendants with a violation of state narcotics law. Bond was fixed by the state magistrate. The defendants did not make bond immediately and were continued in state custody. A day or so later they did make bond before the state magistrate and at the same time requested a preliminary hearing before the magistrate.

A preliminary hearing before the magistrate was set on three occasions. The first time the State's witnesses were unavailable and the case was apparently "generally continued" without objection. Counsel who represented the defendants at such hearing was uncertain about whether the State's witnesses were present or not on the second occasion but, in any event, the hearing was again continued without objection. The State's witnesses were available on November 5, 1980, at the third hearing but that hearing was aborted by the defendants' motion to disqualify the sitting magistrate, which motion was granted.

On November 10, 1980, a few days after the preliminary hearing had been aborted by the defendants' motion, the first session of the state grand jury subsequent to the defendants' arrests convened. The state prosecuting officer testified that he was prepared at that time to submit the case for narcotics violation under state law against the defendants to that jury. However, before he could submit the case the state prosecuting officer was telephoned by the United States Attorney. In this telephone conversation the United States Attorney

told the state prosecutor that certain information had come into his possession indicating that the further prosecution of the narcotics case against the defendants should be in the federal rather than the state court. He requested an opportunity to discuss the matter with the state prosecutor and that, until such discussion, further steps in the state case be deferred. The state prosecutor agreed.

The meeting of the two prosecutors took place on December 5. The United States Attorney pointed out that, when the defendant Iaquinta had been searched, a paper had been found with a number of telephone numbers written on it. Among such telephone numbers was the office phone number and the unlisted home phone number of the state prosecutor's successor, who was shortly to take office. The federal prosecutor suggested that, under those circumstances, it would be prudent for the state prosecutor "to waive" in favor of a federal prosecution. The state prosecutor testified that, after reflection, he agreed.[5] The United States Attorney proceeded immediately to present to the federal grand jury on December 10 an indictment of the defendants on the federal narcotics charge. The grand jury returned a "true bill" on the same day and the defendants were then arrested by federal officers.

Sometime after the defendants were arrested by federal officers under the federal indictment on narcotics charges, the defendant Iaquinta was indicted on the firearms charges. While the violations on which this indictment was based occurred during the cooperative state and federal investigation, this prosecution was not intended as a part of that cooperative investigation, but was a prosecution for which there was a basis only in federal law.

Such was the status of the cases when the defendants moved to dismiss the indictments under the Speedy Trial Act. It was the defendants' position that their arrests on August 7, 1980, by state officers, who were accompanied at the time by federal officers, constituted an "arrest" under the Speedy Trial Act of 1974, and that the failure of the Government to indict them within thirty days of such arrests mandated dismissal of the federal indictments. They, however, make no contention of a violation of their Fifth or Sixth Amendment rights in connection with any delay in their federal prosecution.[6] The reason for such failure is manifest. The delay in federal prosecution has not caused them any substantial prejudice; and, while they have suggested that the delay was an intentional device to gain a tactical advantage, they have offered no credible evidence to support such a claim nor did the district court make any finding to such effect.

After a hearing, which included testimony in favor of and against the motions, the district court granted the defendants' motions, finding "that the arrest of defendants on August 7, 1980 set into motion the applicable time periods of the Speedy Trial Act with respect to all federal offenses that resulted from or were 'in connection' with the circumstances bringing about the arrest." It based this finding primarily on its conclusion that "the federal involvement in [the investigation and arrest] in August, 1980 was far reaching and much more extensive than would be normally undertaken by federal agents in merely assisting a state prosecution." By way of reinforcement of this conclusion, it said that "the pendency of state proceedings" did not place "a cloud over the federal government's timely prosecution of the defendants ..." nor was the federal government under any "duty or compulsion to *delay* its prosecution until after the State indicated its intention not to proceed further on the state arrest." It, also, adverts in the course of its order to the fact that the State did not procure an in-

---

5. In requesting such waiver the United States Attorney was unquestionably seeking to follow the "Petite policy" of the Department of Justice. *See Rinaldi v. United States,* 434 U.S. 22, 27–28, 98 S.Ct. 81, 84–85, 54 L.Ed.2d 207 (1977); *United States v. Ferrs,* 503 F.Supp. 187, 189 (E.D.Pa.1980).

6. *See Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971).

dictment and that, while preliminary hearings "were scheduled" the State "for reasons not apparent . . . failed to appear or to request continuances." Finally, it said:

"The Court need not inquire into the motives for the federal indictment of defendants. The facts and circumstances of these cases are governed by the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.*, and the provisions of that Act are specific and the sanctions under Section 3162 are mandatory." [7]

The sole issue to be resolved on this appeal turns on the construction of the provisions of the Speedy Trial Act. There is no dispute with respect to the relevant language of the Act. The Speedy Trial Act is intended to mandate an orderly and expeditious procedure for federal criminal prosecutions by fixing specific, mechanical time limits within which the various progressions in the prosecution must occur. In its arbitrary time limits, it is unlike the speedy trial rights under either the Sixth Amendment or the due process clause of the Fifth Amendment, both of which apply flexible standards, governed largely by considerations of prejudice in delays in prosecution. Also, again unlike the due process clause of the Fifth Amendment which may apply to pre-arrest delay, the Speedy Trial Act has as its starting point the arrest of the defendant.[8] Since the Act applies only to federal prosecutions it is only a *federal* arrest, not a state arrest, which will trigger the commencement of the time limits set in the Act. In so providing, the Act is consistent with "the doctrine of dual sovereignty, which recognizes that 'the federal government is not bound by the actions of state authorities and that successive state and federal prosecutions are constitutionally permissible.' " *United States v. Wilson,* 657 F.2d 755, 767 (5th Cir. 1981); *United States v. Hendricks,* 661 F.2d 38, 40, n.1 (5th Cir. 1981).[9]

The district court would, however, create an exception where there has been "substantial" cooperation among state and federal officers in an investigation resulting in a state arrest, followed later by a federal arrest and prosecution. In such a case the district court would fix the commencement of the time limits established in the federal Act by the state arrest and not the later federal arrest. In other words, it would treat the state arrest for purposes of the Act as a federal arrest. Neither the language of the Act nor good reasons supports the proposed exception; and all the authorities which have confronted the issue have ruled against it.

The earliest case to confront the issue was *United States v. Mejias,* 552 F.2d 435 (2d Cir.), *cert. denied,* 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 115 (1977). In that case both the New York City Police and the federal authorities had targeted for investigation the street distribution of narcotics in New York City. It was agreed "to coordinate the investigations," but, much like the situation in this case, it was agreed that the prosecution of any "substantive offenses" developed in the investigations would be handled by the New York City Prosecutor and "that the timing of any arrest was to be cleared first with the New York City Prosecutor." [10] As a result of such investigations, defendants were arrested on a state charge on September 3 and October 4, 1974. Federal Drug Enforcement Adminis-

---

7. 515 F.Supp. at 710.

8. Subsection (b) of the Act directs that "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested . . . ."

9. It has long been the rule that "an act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each." *United States v. Lanza,* 260 U.S. 377, 382, 43 S.Ct. 141, 142, 67 L.Ed. 314 (1922). In conformity with this principle, the double jeopardy clause of the Fifth Amendment does not preclude either the state or federal government from prosecuting an individual, even though he has already been prosecuted by the other for the same illegal activity. *Abbate v. United States,* 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959); *Bartkus v. Illinois,* 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959).

10. 552 F.2d at 440.

tration agents were present and assisted the City police officers in the arrests, but the arrests were made by a member of the City police force and were approved in advance by an Assistant District Attorney, New York County. State prosecution followed. However, that prosecution was jeopardized by an order of the state court suppressing vital evidence seized during the search of Mejias' apartment. The federal government some three months later began a grand jury investigation of the same offenses for which the defendants had earlier been arrested by state authorities. The reason for the federal prosecution was frankly stated. It "was conducted because the ability of the state authorities to prosecute appellants successfully had been jeopardized by the state court's granting the motion to suppress evidence seized at Mejias' and the 30th Street apartments."[11] The federal grand jury investigation was based on the state-compiled evidence and, as the Government contended, some evidence developed independently. The actual indictment of the defendant was returned on February 19, 1976, more than a year and a half after the defendant's arrest by City officers. The defendant moved to dismiss the indictment, claiming that the agreement of federal and state authorities "to cooperate in the investigation and prosecution," "the resultant pooling of resources and manpower," and "the presence of federal agents at each of the state arrests," taken together, was sufficient to charge the federal government with the state arrests "for speedy trial purposes."

In reaching its conclusion to deny the motion, the Court began with the premise that it was "in the public interest for federal and state law enforcement agencies to coordinate their efforts in situations of concurrent jurisdictions," and that this is particularly so in connection with the "traffic in dangerous drugs." It, however, found deference by federal authorities in favor of

state prosecution in instances of such state and federal cooperation was perfectly proper as a prudent husbanding of judicial resources between state and federal law enforcement staffs. It said that if there were delays by the state in the state prosecutions, there was "no reason to fault the government for the delay in the state proceedings." But, more to the point, it declared that to hold the arrest by state officers was a federal arrest would in effect be a rejection of the doctrine of dual sovereignty.[12] Finally, it said that to charge the federal government with the state arrests for speedy trial purposes, "would be to force immediate federal indictments and trials of state arrestees in joint jurisdiction cases, thereby crowding the federal court calendar ...."[13] Such a result it found not to be in the public interest. It thus upheld the denial of the motion to dismiss for failure to comply with the Speedy Trial Act.[14]

Again, in the later case of *United States v. Lai Ming Tanu*, 589 F.2d 82 (2d Cir. 1978), there was a joint narcotics investigation. The proof of guilt consisted of a purchase of narcotics by an undercover agent from the defendant. Such purchase was financed *entirely* by the federal government. Moreover, when the arrest was made by the state officer, "the heroin was taken into custody by the DEA, not the City Police." As a result of the purchase, the Court said that "[t]he federal government, at that point, had all the evidence it needed for a successful prosecution. The joint task force decided, however, to prosecute the three defendants in the state court ...." The reason for such decision was stated: the State "impose[s] heavier statutory sentences." After her arrest the defendant appeared over a period of 27 months on 64 occasions in the state Supreme Court, "where she continually re-

11. *Id.* at 441.

12. *Id.* at 441–42.

13. *Id.* at 441.

14. This point is developed at greater length in *United States v. Ferrs*, 503 F.Supp. 187, 189 (E.D.Pa.1980).

quested a speedy trial."[15] Finally, on the sixty-fourth occasion, the state court dismissed the indictment with prejudice on the ground that the defendant had been denied her speedy trial rights under state law. A year and a half after this dismissal of the state indictment, the defendant was indicted by the federal government. This federal "prosecution in practical effect, though not technically, was the same prosecution [as had been begun by the state earlier]."[16] Though it recognized that the facts in this case were somewhat different from those in *Mejias*, the Court denied dismissal of the federal prosecution under the Speedy Trial Act, saying:

"Despite these factual distinctions, however, we are bound to say that in the light of *Mejias* a defendant does not become an 'accused' for Speedy Trial Act purposes until he is under *federal* arrest. *Mejias* is a binding precedent, and we independently agree with its holding so far as the Speedy Trial Act claim is concerned."[17]

In *United States v. Leonard*, 639 F.2d 101 (2d Cir. 1981), a third case from the Second Circuit, the district court dismissed the federal indictment, finding that there was "a substantial federal presence in all the Task Force Operations," in the course of which the arrest in question was made. The actual arrest was made by state officers and the defendant was taken into state custody, though federal agents were present assisting at the arrest of the defendant. The actual investigation leading up to the arrest had been under the supervision of the state prosecutor, who, following the arrest, secured a state search warrant. When the search yielded no evidence, the state prosecutor abandoned the prosecution and ordered the defendant released. Two months later the federal prosecutor filed a federal complaint and arrest warrant for the defendant's arrest on the very same charges for which he had *been earlier arrested* by a state officer. The defendant was arrested

by federal officers, indicted by a federal grand jury, and arraigned before a federal Magistrate. When the case came before the district court, the judge raised on his own motion the Speedy Trial Act. He proceeded then to hold that the defendant had been "federally indicted for the same offenses that served as the basis for his initial arrest" resulting from an investigation in which "there was a substantial federal presence," and that, in such a case "the proper rule ... is to regard the arrest which ultimately eventuates in a federal prosecution, as a federal arrest *ab initio* ... and to extend to that arrest all rights and privileges arising under federal statutes or rules." On appeal, the Court of Appeals, after recognizing that "the crucial issue" was whether the first arrest "was properly characterized as federal," reversed, holding that one was not arrested within the intendment of the Speedy Trial Act until he be taken into custody after a federal arrest for the purposes of responding to a federal charge.[18]

In *United States v. Ferrs*, 503 F.Supp. 187 (E.D.Pa.1980), the defendant was arrested on December 10, 1979, by federal officers but pursuant to a criminal complaint issued upon the affidavit of township police officers and charging a state narcotics violation. The federal officers immediately turned the defendant over to state authorities who charged him with violations of the State's narcotics laws. These state charges were dismissed with prejudice on September 18, 1980, under the State Speedy Trial Act. On October 7, 1980, after dismissal of the state charges, federal charges under federal narcotics laws were filed and the defendant was arrested under those charges by federal officers two weeks later. The defendant moved for dismissal under the Speedy Trial Act, contending that the arrest by federal officers on December 10, triggered the time limits fixed in the Act. In overruling the motion, the court first

**15.**  589 F.2d at 84.

**16.**  *Id.* at 88.

**17.**  *Id.* at 88.

**18.**  639 F.2d at 103–104.

found that the original arrest by federal officers was irrelevant since "the defendant was immediately taken into state custody and charged with violations of state law. [The defendant's] initial arrest was thus 'in connection with' state, not federal charges."[19] It then proceeded to hold that, to rule in a cooperative investigation by state and federal officers, that the federal Speedy Trial Act would "start ticking at the time of the initial state arrest," would create an intolerable dilemma, undermining the federal constitutional rule that separate sovereigns can prosecute separately because

"if [the United States Attorney] were to indict immediately after the state arrest, he would violate the spirit of the 'Petite policy' and perhaps preempt further state proceedings; if he were to wait for the state prosecution to run its course, he would risk violating the Speedy Trial Act. In either case, 'federal law enforcement must necessarily be hindered.' *See Abbate*, 359 U.S. at 195, 79 S.Ct. at 671. State law enforcement would likewise be impeded. This would result in 'a marked change in the distribution of powers to administer criminal justice,' . . . and practically would either preclude the federal government from proceeding when the state prosecution became endangered or perhaps preclude state prosecution altogether."[20]

The court, accordingly denied the motion.

The defendants cite in contradiction of the above authorities two district court decisions from the Southern District of New York, *United States v. Hillegas*, 443 F.Supp. 221 (S.D.N.Y.1977), and *United States v. LaCruz*, 441 F.Supp. 1261 (S.D.N.Y.1977). Neither is apposite. In *LaCruz*, as the Court in *Leonard* observed, "the defendant was arrested on a federal complaint and arraigned before a United States Magistrate," on a federal charge.[21] Similarly, in *Hillegas*, only federal arrests on federal charges were involved. Moreover, this decision was reversed.[22]

Martoche, *The Federal Speedy Trial Act: An Introduction and Guide*, 4 Nat. Journal of Criminal Defense 295 (1978) is also cited in support of defendants' position. That article does not, however, provide any support; in fact, it is definitely contrary to the defendants' position. Thus, it states (p. 299):

"For this limit to commence, a person must be held for the purpose of answering to a federal charge. Thus, if one is held by state officers on a state charge and subsequently turned over to federal authorities for federal prosecution, the starting date of the time period is the date that the defendant is delivered into federal custody. However, if the person is held in state custody at the request of federal authorities, the date of arrest by the state officers is controlling."

█ It follows under the reasoning of the Second Circuit decisions, that since there was no federal arrest of the defendants and no taking of them into federal custody until after they were indicted by a federal grand jury, there was no violation of the Speedy Trial Act in this prosecution. As we have said, the district court assumes that whether a state arrest on state charges as a result of a joint state-federal criminal investigation triggers the federal Speedy Trial Act turns not on the time of the federal arrest but on whether the federal involvement in the joint investigation was "extensive" or "substantial." The authorities, however, make no such distinction. In fact, the court in *Leonard* actually characterized the federal involvement in that investigation as "a substantial federal presence," but it did not find this fact to alter the rule that the time limits fixed by the Act do not commence to run until there is a federal arrest. Moreover, the federal participation in all the above cases (*Mejias, Lai Ming Tanu, Leonard* and *Ferrs*) was as "extensive" and as "substantial"—actually more extensive

**19.** 503 F.Supp. at 190.

**20.** *Id.* at 189.

**21.** 639 F.2d at 105, n. 4.

**22.** *United States v. Hillegas*, 578 F.2d 453 (2d Cir. 1978).

and substantial in most cases—as it was in this case. It is true that the federal officers in this case supplied some of the money used by the undercover agent in his attempted purchase from the defendant. However, in *Lai Ming Tanu* the federal government supplied all the money used in the purchase of heroin. The fact that the federal officers were present, assisting in the arrests of the defendants by the state officers, and that they cooperated with the state officers in the investigation that led up to the arrests has never been held in any case to render the state arrest *federal.* Similarly, the fact that the federal officers were concededly at the defendants' house when it was searched by the state officers under a state-issued search warrant and did seize the firearms in plain view there was insufficient to trigger the time limits of the Act.

It must be remembered that the federal officers here, unlike the federal officers in *Lai Ming Tanu,* did not take the narcotics seized at the time of the state arrest into their custody. The seized narcotics were taken into custody by the state officers who were making the arrests; and those narcotics were later transferred for analysis by state officers to a state location, where they still were at the time of the hearings on defendants' motions. The narcotics seized were the only part of the search in which the state officers were interested. In fact, the possession by a convicted felon of firearms was exclusively a federal crime. It was therefore natural that the firearms seized were taken by the federal officers. The federal officers at that time, though, did not make an arrest on a firearms charge; in fact, an arrest was only made some months later after that charge had been further investigated and a federal indictment was had.[23]

There is some reference in the district court's opinion to the fact that the federal officers joined in interrogating the defendants while they were being held, after arrest, at the State Police Barracks. Such participation, of itself, would not provide a basis for concluding that the subsequent state arrests were *federal* arrests. What the district court overlooked in this connection is that such interrogation as the federal officers directed at the defendants on that occasion related not to the offense on account of which the defendants had been arrested by the state officers but focused entirely on the identity of the defendants' source in Florida. Such inquiry sought information which might lead to arrests in another state beyond the jurisdiction of the state officers involved in the investigation. The same is true of the discussion between the federal officers, on the one hand, and the defendants and their lawyer, on the other. This discussion again sought information on the source of the firearms discovered in the defendants' residence. Neither inquiry—either that at the police barracks, or that at the defendants' residence—related to the state case; both inquiries were directed at the possibility of criminal offenses by others than either the defendant Iaquinta or his co-defendant Shine. In making their inquiries they were seeking a starting point for another and different investigation from that on which the state and federal officers had been previously engaged. In pointing these particular facts out, we would not be understood as suggesting that participation by federal officers in interrogation of a defendant on the very charge on which he was arrested by state officers, had it occurred, would have rendered the arrest by state officers a federal arrest.

The district court adverts at some length to what it suggests was the disinterest of the state in the prosecution. It states that several state court preliminary hearings "were scheduled, but for reasons not apparent the state failed to appear or to request continuances." As we have already pointed out, the fact of the matter is that, contrary to the district court's finding, three hearings were set. At the first hearing the state's witnesses did not appear and the

---

**23.** It is plain that any attack upon the indictment charging a firearms offense must rest on the Sixth Amendment and not on the Speedy Trial Act. The defendant Iaquinta has not moved for dismissal under the Sixth Amendment.

hearing was "generally continued," to use the phrase of defendants' counsel. At the second hearing, defendants' counsel was uncertain whether the state's witnesses were present and he was equally uncertain as to why the hearing was continued. At the third hearing the state's witnesses were present but the defendants aborted the hearing by filing a motion to disqualify the magistrate. Moreover, the state prosecutor testified that he had not lost interest in the prosecution, that he was prepared to present the case to the first grand jury convened after the defendants' arrests and that he was only dissuaded by the request by the federal prosecutor for a conference. But whether the state prosecutor dallied or not in pressing the state prosecution is not to be charged against the federal officers and cannot be used as a justification for dismissal under the Speedy Trial Act. *United States v. Mejias, supra,* 552 F.2d at 441–42.

Finally, the district court, after declaring it would "not inquire into the motives for the federal indictment of defendants," gently criticizes the federal prosecutor for failing "to clear away or explain" why he did not take any federal action against the defendants until after he talked to the state prosecutor on November 10, 1980. This suggestion assumes erroneously that government prosecutors are obligated to file criminal charges as soon as they have enough *evidence to prosecute.* Assuming *arguendo* that the United States Attorney may have been dilatory in pressing federal charges, such dilatoriness would not be a violation of the Speedy Trial Act. That Act sets, as the district court very properly emphasizes, certain very definite, mechanical-like rules within which one must be indicted *after an arrest* but those rules have nothing to do with what the United States Attorney does pre-arrest. It certainly does not attempt to change the settled principle that, apart from the constraints of the applicable statute of limitations, the time for the commencement of a prosecution—much like the decision whether to prosecute at all—generally lies entirely within the prosecutor's discretion. *United States v. Lovasco,* 431 U.S.

783, 790–96, 97 S.Ct. 2044, 2048–2052, 52 L.Ed.2d 752 (1977). If the delay is such as to offend the due process clause of the Fifth Amendment, the remedy is under that Amendment, but it provides no basis for a remedy under the Speedy Trial Act. *United States v. Marion, supra,* 404 U.S. at 325–26, 92 S.Ct. at 465–466.

For the reasons stated, we conclude that the dismissal of the indictments against the appellees was erroneous, and we accordingly reverse and remand with directions to reinstate such indictments.

REVERSED AND REMANDED WITH DIRECTIONS.